IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| FELICIA PRIAH et al., | ) | CASE NO.: 1:06CV02196 |
| | ) | |
| | ) | |
| Plaintiffs, | ) | JUDGE BOYKO |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | MEMORANDUM IN SUPPORT |
| | ) | OF MOTION TO DISMISS OR, |
| Defendant. | ) | ALTERNATIVELY, FOR |
| | ) | SUMMARY JUDGMENT |

TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

STATEMENT OF ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii

I.       INTRODUCTION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.      FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.     ARGUMENT AND LAW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        A.  THE DISCRETIONARY FUNCTION EXCEPTION TO THE FTCA
            JURISDICTIONALLY BARS PLAINTIFFS' CLAIMS BASED ON THE
            INVESTIGATION AND HANDLING OF LESTER'S KIDNAPING. . . . . . . . . . . . . 10

        B.  PLAINTIFFS' NEGLIGENCE CLAIMS FAIL AS A MATTER OF OHIO LAW. . 15

            1.  Ohio's Wrongful Death Statute Permits Only A Claim By the Estate
                Administrator: All Other Plaintiffs Should Be Dismissed.. . . . . . . . . . . . . . . 15

            2. The United States Is Immune From Liability For Any
               Negligence Claim Based Upon  Lester's Death or Injury. . . . . . . . . . . . . . . . 16

            3. Plaintiffs Cannot Demonstrate A Wrongful Death Claim Under Ohio Law.. . 21

            4. The Government Cannot Be Liable For Negligently Causing
               Lester's Injury or Death Because Werth's Conduct Was Privileged
               And He Acted in Self-Defense. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

IV.     CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

TABLE OF AUTHORITIES

<u>CASES</u>                                                                                              <u>PAGE</u>

<u>Abernathy v. United States</u>, 773 F.2d 184 (8th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

<u>Ashford v. Betleyoun</u>, No. 22930, 2006 WL 1409793 (Ohio Ct. App. May 24, 2006).. . . . . . . . 26

<u>Armstrong v. Best Buy Co., Inc.</u>, 788 N.E.2d 1088 (Ohio 2003). . . . . . . . . . . . . . . . . . . . . . . . 21

<u>Baird v. United States</u>, 653 F.2d 437 (10th Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

<u>Barnes v. United States</u>, 448 F. 3d 1065 (8th Cir. 2006).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

<u>Beasley v. Piekutowsky</u>, No. 4:02CV00823, 2005 WL 1463485
  (E.D. Mo. June 21, 2005).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

<u>Berkovitz by Berkovitz v. United States</u>, 486 U.S. 531 (1988).. . . . . . . . . . . . . . . . . . . . 11, 12, 13

<u>Blakely v. United States</u>, 276 F.3d 853 (6th Cir. 2002).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

<u>Brewer v. J.C. Penney Co.</u>, C.A. No. 2523, 1977 WL 198894
  (Ohio Ct. App. June 15, 1977).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

<u>Brosseau v. Haugen</u>, 543 U.S. 194 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

<u>Burger v. United States</u>, 748 F. Supp. 1265 (S.D. Ohio 1990). . . . . . . . . . . . . . . . . . . . . 11, 12, 13

<u>Chin v. Wilhelm</u>, No. CCB-02-1551, CCB-04-4054, 2006 WL 827343
  (D. Md. March 24, 2006).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

<u>Cole v. United States</u>, 874 F. Supp. 1011 (D. Neb. 1995).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

<u>Conte v. Gen. Housewares Corp.</u>, 215 F.3d 628 (6th Cir.19). . . . . . . . . . . . . . . . . . . . . . . . . . . 22

<u>Cook v. City of Cincinnati</u>, 658 N.E.2d 814 (Ohio Ct. App.1995). . . . . . . . . . . . . . . . . . . . . . . . 18

<u>Curtis v. Pracht</u>, 202 F. Supp. 2d 406 (D. Md. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

<u>Crow v. United States</u>, 634 F. Supp. 1085 (D. Kan. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

<u>Downs v. United States</u>, 522 F.2d 990 (6th Cir. 1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Drewitt v. Pratt, 999 F.2d 774 (4th Cir. 1993)................................... 20

Dudley v. Eden, 260 F.3d 722 (6th Cir. 2001)................................... 20

Estate of Bing v. City of Whitehall, Ohio, 373 F. Supp. 2d 770 (S.D. Ohio 2005)......... 16, 25

Ewolski v. City of Brunswick, 287 F.3d 492 (6th Cir. 2002). ......................... 18, 19

Fabrey v. McDonald Village Police Dep't, 639 N.E.2d 31 (1994). ....................... 19

Flax v. United States, 847 F. Supp. 1183 (D.N.J. 1994)............................. 13

Fla. Auto Auction of Orlando v. United States, 74 F. 3d 498 (4th Cir. 1996)............... 23

Fields v. Dailey, 587 N.E.2d 400 (Ohio Ct. App. 1990). ........................... 25, 26

Georgia Casualty & Surety Co. v. United States, 823 F.2d 260 (8th Cir. 1987)............. 13

Goldfuss v. Davidson, 679 N.E.2d 1099 (Ohio 1965)................................ 25

Guccione v. United States, 847 F.2d 1031 (2d Cir. 1988)............................. 23

Harris v. Coweta County Ga., 406 F.3d 1307 (11th Cir. 2005)......................... 20

Harris v. United States, 422 F.3d 322, 326-27 (6th Cir. 2005). ....................... 17

Hitch v. Ohio Dep't of Mental Health, 683 N.E.2d 38 (Ohio Ct. App. 1996) .............. 21

Hydrogen Tech. Corp. v. United States, 831 F.2d 1155 (1st Cir. 1987). .................. 14

Jewell v. City of Columbus, 485 N.E. 2d 266 (Ohio Ct. App. 1984). .................... 21

Kanar v. United States, 118 F.3d 527 (7th Cir. 1997).............................. 10

Kelly v. United States, 924 F.2d 355 (1st Cir. 1991)............................. 12, 14

Kendzierski v. Carney, No. 22739, 2005 WL 3482397 (Ohio Ct. App. Dec. 21, 2005)........ 19

Lehman v. Nakshian, 453 U.S. 156 (1981). ..................................... 10

Mafidge v. United States, 893 F. Supp. 691 (S.D. Tex. 1995). ........................ 23

Marivilla v. United States, 867 F. Supp. 1363 (N.D. Ill. 1994)......................... 14

McNutt v. Gen. Motors Acceptance Corp. of Ind., 298 U.S. 178  (1936). . . . . . . . . . . . . . . . . . 15

Medina v. United States, 259 F.3d 220 (4th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Merced v. United States, 856 F. Supp. 826 (S.D.N.Y. 1994). . . . . . . . . . . . . . . . . . . . . . . . . 23

Mesa v. United States, 123 F.3d 1435 (11th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Mesa v. United States, 837 F. Supp 1210, 1213 (S.D. Fla. 1993). . . . . . . . . . . . . . . . . . . . . . 14

Miller v. McAllister, 169 Ohio St. 487. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Montez ex rel. Estate of Hearlson v. United States, 359 F.3d 392 (6th Cir. 2004). . . . . . 11, 13, 14

Myers v. United States, 17 F.3d 890 (6th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

Norton v. United States, 581 F.2d 390 (5th Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Patentas v. United States, 687 F.2d 707 (3rd Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Piechowicz v. United States, 885 F.2d 1207 (4th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . 14

Pooler v. United States, 787 F.2d 868 (3d Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Power v. Boyles, 673 N.E.2d 617 (Ohio Ct. App. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

Rahn v. Whitehall, 574 N.E.2d 567 (Ohio Ct. App.1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Ramsey v. Neiman, 634 N.E.2d (Ohio 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Reeves v, United States Dep't of Treas. Bureau of Alcohol, Tobacco & Firearms,
   809 F. Supp. 92 (N.D. Ga. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Rich v. United States, 119 F.3d 447 (6th Cir.1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Rosebush v. United States, 119 F.3d 438 (6th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Rourke v. United States, 744 F. Supp 100, 102 (E.D. Pa. 1988). . . . . . . . . . . . . . . . . . . . . . . 15

Schultz v. Elm Beverage Shoppe, 533 N.E.2d 349 (Ohio 1988) . . . . . . . . . . . . . . . . . . . . 26, 27

Skinner v. Brooks 58 N.E.2d 697 (Ohio Ct. App. 1944). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Smith v. Freeland, 954 F.2d 343 (6th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Smith v. United States, 375 F.2d 243 (5th Cir.1967).  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Soriano v. United States, 352 U.S. 270 (1957). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

State v. Barnes, 759 N.E.2d 1240 (Ohio 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

State v. Ervin, No. 87333 2006 WL 2507563 (Ohio Ct. App. Aug. 31, 2006). . . . . . . . . . . . . 9, 24

State v. Waller, No. 87279, 2006 WL 2692590 (Ohio Ct. App. Sept. 21, 2006).  . . . . . . . . . . . . 9

Strother v.Hutchinson, 67 Ohio St.2d 282 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Tinch v. United States, 189 F. Supp. 2d 313 (D. Md. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . 17

United States v. Ervin, Nos. 05-3374, 3375,
 2006 WL 3791300 (6th Cir. Dec. 26, 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 19, 24, 26

United States v. Gaubert, 499 U.S. 315 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

United States v. Olson, 546 U.S. 43, 1265 S. Ct. 510 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . 17

United States v. Smith, 499 U.S. 160 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

United States v. Testan, 424 U.S. 392 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Vaughn v. United States, No. 96-6336, 1997 WL 809911 (6th Cir. Dec. 16, 1997). . . . . . . . . . 22

Wissel v. Ohio High School Athletic Assoc., 605 N.E.2d 458 (Ohio Ct. App. 1992). . . . . . . . . 22

## FEDERAL STATUTES

18 U.S.C. § 924. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

18 U.S.C. § 1114. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

28 U.S.C. § 1346. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1346(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

28 U.S.C. § 2674. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

28 U.S.C. § 2680. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

28 U.S.C. § 2680(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

42 U.S.C. § 1983. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

STATE STATUTES

Ohio Rev. Code § 9.86.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

Ohio Rev. Code § 9.88.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Ohio Rev. Code § 2125.01.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Ohio Rev. Code § 2125.02(A)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Ohio Rev. Code § 2305.23.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Ohio Rev. Code § 2743.02 (A)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 22

Ohio Rev. Code § 2743.02 (A)(3)(a).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Ohio Rev. Code § 2743.02 (A)(3)(b).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Ohio Rev. Code § 2744.01(c)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Ohio Rev. Code § 2744.02.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Ohio Rev. Code § 2744.03(A)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

Ohio Rev. Code § 2744.03(A)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

MISCELLANEOUS

Restatement 2d Torts § 314, 321-324A.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Restatement 2d Torts § 323.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

Restatement of the Law 2d, Torts (1979) 355 § 890. . . . . . . . . . . . . . . . . . . . . . . . . . . 26

<u>STATEMENT OF ISSUES</u>

1. Whether the discretionary function exception to the FTCA jurisdictionally bars Plaintiffs' claims based on the investigation and handling of Darnell Lester's kidnaping and the arrest of his assailants.

2. Whether  Plaintiffs' negligence claims fail as a matter of Ohio law because Ohio's wrongful death statute permits only a claim by the estate administrator and all other Plaintiffs should therefore be dismissed.

3. Whether the United States is immune from liability for any negligence claim based upon Lester's death or injury under Ohio law which grants law enforcement officers immunity from negligence claims.

4. Whether the government can be liable for negligently causing Lester injury or death where Special Agent Werth's conduct was privileged and he acted in self-defense.

<u>SUMMARY OF ARGUMENT</u>

The discretionary function exception to the FTCA jurisdictionally bars Plaintiffs' claims based on the investigation and handling of Darnell Lester's kidnaping and the arrest of his assailants.  The government's conduct in planning and investigating the kidnaping of Lester and the arrest and apprehension of his assailants are discretionary functions for which sovereign immunity has not been waived.

Further, Plaintiffs' negligence claims fail as a matter of Ohio law because Ohio's wrongful death statute permits only a claim by the estate administrator - Ester Felicia Priah -  and all other Plaintiffs should therefore be dismissed.   Further,  the United States is immune from liability for any negligence claim based upon  Lester's death or injury because under the FTCA, the

viii

government is entitled to assert any immunity to which a law enforcement officer would be entitled.  Under Ohio law, federal law enforcement officers are immune from wrongful death or personal injury actions based upon negligence.  Finally,  the federal government can not be liable for negligently causing Lester injury or death because Special Agent Werth's conduct in shooting at Ervin was privileged and he acted in self-defense.

## I. INTRODUCTION

On September 12, 2006, Plaintiffs Felicia Priah, individually and as the administratrix of the estate of Darnell Lester, Dana Watkins, as guardian and parent of Diamond Feneil Lester, Diamond Feneil Lester, a minor, Karen Burge, as guardian and parent of Darneisha Burge, Darneisha Burge, a minor, Dakeita Bryant, as guardian and parent of Dakeita Lester, Dakeita Lester, a minor, Deborah Duckworth, individually and as guardian and parent of Ti'Yon Benjamin and Deon Feneil Benjamin, Ti'yon Benjamin, a minor, and Deon Feneil Benjamin, a minor, filed their Complaint against the United States of America.  The Complaint purports to state claims under and alleges jurisdiction pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346 ("FTCA") and specifically avers that administrative claims requirements have been exhausted.  (R. 1 Compl. ¶ 19).  The Complaint alleges that the negligence of Federal Bureau of Investigation ("FBI") special agents, acting in the scope of federal duties, was the proximate cause of the death of Darnell Lester ("Lester"), and purports to state claims of negligence/wrongful death and survivorship. (Compl. ¶¶ 18, 56 - 60, 61-62).

## II. FACTS

The facts pertaining to this case were the subject of extensive testimony in the criminal trials of Lester's kidnapers and are summarized herein.  Following his arrest in April 2002 for drug trafficking, Lester became a cooperating witness for the FBI's New York office, working for Special Agent Brian O'Roarke ("O'Roarke").  (O'Roarke Tr. at 296, 305-07, 342-43).[1]  Lester's

---

[1]Trial testimony will refer to the federal criminal trial of Lester's kidnapers held on August 24 through September 2, 2004, in Case No. 1:04CR00013 unless otherwise specified and shall be referenced by using the last name of the witness or event, e.g., O'Roarke Tr. at ___.  Referenced excerpts are attached hereto as Ex. A.  All references to the state court trial in Cuyahoga County Common Pleas Case No. 478627A, commencing on June 24, 2005, will similarly state the

1

work included conducting controlled drug purchases with individuals suspected of contract murder and drug murder.  (Id. at 309-10).  During December 2003, however, Lester was not involved in any controlled drug transactions for the FBI.  (Id. at 310-11).  As a cooperating witness, Lester was apprized of, continually admonished and agreed that he would follow the Attorney General's Guidelines for cooperating witnesses designed to ensure that informants not participate in violent or illegal conduct or criminal activity without express FBI authorization. (Id. at 307-308).

At approximately 5:00 P.M. on December 22, 2003, Lester was in Cleveland, and along with Veron Black, Andre Glasgow and Clifford Gillespie, drove a GMC van to EZ Foods to buy beer and tobacco products.  (Glasgow Tr. at 221-23; Gillespie Tr. at 142-43).  At EZ Foods, they encountered a group of people standing in front of the store, including Aubrey Waller, a.k.a. "Arby," ("Waller") Gary Ervin, a.k.a. "Gino," ("Ervin") and Ervin's brother Wayne.  (Gillespie Tr. at 143).  Lester exited the van and then returned after several minutes.  (Glasgow Tr. at 224-25; Black Tr. at 71).

Antwan McPherson, a.k.a. "Fat Back," entered the back of the van and they began driving. (Glasgow Tr. at 225).  Waller, Ervin, and the group that had initially been in front of EZ Foods relocated to Cedar's Finest, a.k.a. "Moe's Supermarket," a convenience store located across the street.  (Black Tr. at 75; Gillespie Tr. at 147-48).  After he had entered the van, McPherson told Lester "about what's going to happen," that Waller "was planning a kidnap and robbing."  (Black Tr. at 137-38).  Lester was angered by McPherson's statements and appeared "shocked,

---

witnesses name followed by "state Tr." Excerpts of referenced state testimony are attached hereto as Ex. B.

surprised."  (Id. at 73; Glasgow Tr. at 229).

Lester then drove the van from EZ Foods to Cedar's Finest, which was at an intersection known to be a drug area.  (Glasgow Tr. at 228, 231; Black Tr. at 73, 138).  Lester exited the van and entered into a conversation with Waller near the rear of the van.  (Glasgow Tr. at 229, 231).  The occupants of the van then heard commotion, and bumping and scuffling on the driver's side of the van.  (Id.; Black Tr. at 78; Gillespie Tr. at 148).  The van started "rocking back and forth," giving its occupants the impression that a fight was underway outside.  (Black Tr. at 78).  Ervin opened the driver's door of the van, displayed a medium-sized, long-barreled firearm and  told the van's occupants, "You know what it is," meaning that they should put their hands up.  (Glasgow Tr. at 232-33; Black Tr. at 79, 121; Gillespie Tr. at 149).   The occupants other than Lester were eventually ordered out of the van after seeing Waller and several others drag Lester into the van.  (Gillespie Tr. at 149-50).  Waller struck Lester in the head repeatedly with a firearm to the point where he started bleeding and was not talking or moving.  (Black Tr. at 79-80; Gillespie Tr. at 148-53; Glasgow Tr. at 234-36).  The van's occupants ultimately told various people in the neighborhood that Lester had been kidnaped.  (Gillespie Tr. at 149-53, Glasgow Tr. at 238).  Waller later drove to Glasgow's house and asked Black whether he knew where Lester's money was "to release him to let him go."  (Black Tr. at 80-84).

Lester's mother was alerted to his kidnaping.  She attempted to call him on his cellular phone.  (Priah Tr. at 204).  A male answered the phone, identified himself under Ervin's street name, "Gino," and asked who was calling.  (Id.).  When Lester's mother identified herself, the man hung up, and none of her subsequent calls were answered.  (Id.).

Around 9:00 P.M. that night, O'Roarke received a call on his cellular phone while driving

3

home from work in New York.  (O'Roarke Tr. at 311- 21).  He did not recognize the phone number but discerned from the area code that the call came from Cleveland.  (Id. at 312).  O'Roarke generally received no calls from Cleveland other than those placed by Lester.  (Id.).  In December, 2003, Lester was not involved in any active FBI investigation.  (O'Roarke Tr. at 310).  Upon answering the call, O'Roarke found that Lester was speaking in "street jargon" and generally acting "nervous."  (O'Roarke Tr. at 312).  Lester told O'Roarke to call a different Cleveland phone number, instructing him, "Call my guy there."  (Id. at 312-13).  The conversation was "rushed" and "alarming" to O'Roarke because Lester was normally a very "composed individual."  (Id. at 313).  O'Roarke called the number that Lester had given him, finding only a generic voice-mail message.  (Id.).[2]

O'Roarke reported Lester's behavior to his partner and his supervisor and then dialed the number from which Lester had called him.  (Id.).  Reaching Lester, O'Roarke asked him a series of yes and no questions.  (Id.).  Based on Lester's responses and behavior, O'Roarke was concerned that Lester was unable to speak freely and that he had been kidnaped.  O'Roarke sought to obtain information so that the FBI would "know what we would be up against if we tried to extricate him from the situation."  (Id. at 315-16).  Based upon Lester's responses to  O'Roarke's questions, O'Roarke concluded that Lester had been kidnaped and was being held against his will in a house by approximately five or six armed people.  (Id. at 316, 324).  In O'Roarke's experience, it was common for drug dealers to be kidnaped and held for ransoms of drugs or money.  (Id. at 316).

---

[2] O'Roarke eventually learned that the telephone number belonged to Cleveland FBI Agent Robert Butrey, who had briefly met Lester previously.  (O'Roarke Tr. at 319; Vogt Tr. at 432).

During the night of December 22, 2003,  and into the early morning of December 23, 2003, O'Roarke had approximately three dozen conversations with Lester from his cell phone, none lasting more than a minute or two and most roughly 20 seconds in duration.  (Id. at 317, 328, 348, McClure Tr. at 1047-48, 1052-54).  The pace of these calls became "more urgent," and Lester began to lose some composure and began to sound "increasingly nervous ... and more aggressive."  (O'Roarke Tr. at 328).  During these calls, an unidentified person would occasionally answer the phone and then pass the phone to Lester.  (Id. at 320).  O'Roarke thought that others might be listening to his conversations with Lester, so he portrayed himself as part of Lester's "crew,"  to maintain contact with Lester and decrease his captors' suspicions.  (Id. at 320-21).  O'Roarke testified; "I knew I had to get whatever help I could to Darnell to try to extricate him from the situation.  I told him 'get out if you can, but we're working on it.'" (Id. at 317).

O'Roarke communicated the situation to the duty officer in Cleveland and Supervisory Special Agent Steven Vogt ("Vogt") in the Cleveland FBI office.  (O'Roarke Tr. at 317-18).  After being briefed, Vogt set up a command post at the Cleveland FBI office and began to track incoming information.  (Vogt Tr. at 377).   Hoping to find the house in which Lester was being held, the FBI attempted unsuccessfully to pinpoint the location of the cellular phone bearing the 7466 number from which Lester had been calling.  (Id. at 377-78, 380-81, 385, 387; O'Roarke Tr. at 322).  Vogt also immediately notified the Cleveland FBI Assistant Special Agent in Charge, John Kavanaugh, who activated an FBI SWAT team by contacting SWAT team leader Special Agent Robert Kirwan ("Kirwan").  (Vogt Tr. at 380, 384-85, 443-44; Kirwan Tr. at 13-14).  The SWAT unit was deployed to attempt to rescue Lester and apprehend and arrest his captors.  (Hopper Tr. at 471-72).

5

The initial plan developed was to locate the house where the kidnapers held Lester so that they could be apprehended.  (O'Roarke Tr. at 324).  At approximately 10:30 p.m., Lester told O'Roarke to meet his captors at East 83rd Street and Euclid Avenue to make the drop.  (O'Roarke State Tr. 838-843).  Vogt believed a house entry would be less risky than a vehicle stop, and attempted to delay the meeting in an effort to locate the house where Lester was being held by tracing the cell phone signal.  (Vogt Tr. at 377, 380-84).   The FBI was unable to pinpoint the house from which Lester was calling, however. (Vogt at 387).   The kidnapers arranged a meeting which was to occur at a Rally's restaurant located at East 81st Street and Euclid in Cleveland.  (O'Roarke Tr. at 329).  The kidnapers were to arrive in a green, four-door GMC Jimmy SUV.  (Id.).  O'Roarke did not originally know if Lester would accompany the kidnapers in the vehicle, but Vogt believed it was a safer course of action, fearing that if the agents apprehended and arrested the kidnappers at a meeting place, they would refuse to divulge Lester's location and he would be killed where he was being held.  (O'Roarke Tr. at 326, 349: Vogt Tr. at 389-99).

At approximately 1:00 A.M., Vogt sent the SWAT team to the Rally's for the meeting.  (Vogt Tr. at 387-88; Kirwan Tr. at 21-23).  The SWAT team, consisting of 18 agents and five vehicles, was led by Kirwan.  (Kirwan Tr. at 4, 17, 20).  A final briefing was held and the team was expressly briefed on tactics for performing a felony vehicle stop and the FBI's deadly force policy in relation to a felony vehicle stop.  (Hopper Tr. at Tr. 472-73; Kirwan Tr. at 19-20, 69).  Essentially, in the context of a vehicle stop, an agent may use deadly force "if his life is in danger or any other third party's life is in danger of death or serious injury."  (Hopper at 473-74; see also, Werth 604-06).  Agents are not permitted to shoot at a vehicle to disable the vehicle but deadly force can be directed at the vehicle's operator if an agent or someone else is threatened with death

or serious injury. (Hopper Tr. at 474; Werth Tr. at 604; Kirwan Tr. at 19-20).  At this briefing, the SWAT team was not specifically briefed about whether Lester would be in the Jimmy.  (Vogt Tr. at 416-17).

When Kirwan received word that the Jimmy was at the Rally's, he ordered all of the SWAT vehicles to converge on the parking lot and contain the Jimmy.  (Kirwan Tr. at 24).  The vehicles "arrived almost simultaneously," displaying flashing lights and boxed the Jimmy in or established "fairly good containment."  (Id. at 2; Hopper Tr. at 483-84).  Special Agent Todd Werth ("Werth') exited from a car and took a position to "cover" the Jimmy after the vehicle had stopped.  (Kirwan Tr. at 28, 62-63; Werth Tr. at 590-91).[3]  The Jimmy "surged forward," however, striking an FBI vehicle first and then an FBI van containing Kirwan.  (Kirwan Tr. at 26).  Another FBI vehicle then struck the Jimmy, turning the vehicle to the west, whereupon the Jimmy "shot out of the parking lot headed west."  (Kirwan Tr. at 27).  The Jimmy accelerated from the parking lot, moving towards the position where Werth was standing.  (Id. at 29, 34).

Werth saw that the Jimmy "all of a sudden turned towards me, and was coming at me, was picking up speed."  (Werth Tr. at 591; Kirwan Tr. at 29-34).  Within a "fraction of a second," Werth made eye contact with the driver, who was later revealed to be Ervin.  (Id. at 591, 652).  Werth saw Ervin "coming at me," believed that Ervin was trying to run him over and that his life was in danger.  (Id. at 591, 602-04, 610-11; Kirwan Tr. at 29, 34).  Kirwan saw the vehicle moving toward Werth and it did not seem like it would stop.  (Kirwan Tr. at 34-35).  Werth adopted a shooting stance and, within one second, fired his weapon three times through the

---

[3]Exiting the vehicle to get to position of cover to extract the individuals is necessary to conduct a felony vehicle stop (Hopper Tr. at 506-16; Kirwan Tr. at 70-72).

drivers' side window at the driver of the vehicle - Ervin.  (Kirwan Tr. at 29-30, 46, 55; Werth Tr. at 507, 591, 594).  Werth "felt the Jimmy was still a threat to other agents as it was passing me" and perceived that Ervin was attempting "to hurt ... other agents in the area."  (Werth Tr.  at 599, 611).   Werth testified that his actions in shooting at Ervin to stop the vehicle would not have differed if he had known Lester was in the vehicle.  (Werth Tr. at 609-11).  Two of Werth's rounds struck Ervin in his face and hand, respectively.  (Werth Tr. at 629).  In addition, another round fired by Werth struck Lester, killing him.  (Id. at 608-09, 629).  The Jimmy was then hit by another FBI vehicle, which spun the Jimmy, which ended up against a fence on the west side of East 81st Street.  (Kirwan Tr. at 29).  At that point, several FBI agents exited their vehicles and approached the Jimmy, to pull the occupants out of the vehicle to gain control.  (Id. at 30).

The rear door of the Jimmy opened and Waller produced a semiautomatic handgun, was preparing to exit the Jimmy, and fired two or three times at the FBI agents in one of the vehicles.  (Brunswick Tr. at 790-91, 808-09, 823; Riolo Tr. at 836-37, 865-66).  Agent Robert McBride then fired his submachine gun once from the passenger seat of an FBI SWAT vehicle. (Brunswick Tr. at 791; Kirwan Tr. at 35, 53).  Waller raised his hands "like he was going to give up."  (Brunswick Tr. at 791; Riolo Tr. at 837).  Waller's gun was no longer visible; it had jammed and was discarded in the rear of the Jimmy.  (Brunswick Tr. at 791, 794).  Lester was thereafter discovered in the front passenger seat of the Jimmy. (Vogt Tr. at 389-92; Kirwan Tr. at 48; Hasan Tr. at 937, 940; Willson Tr. at 954).

Ervin was taken to the hospital and Waller was arrested at the scene. (Riolo Tr. at 838-39, 843).  Both were charged with violating 18 U.S.C. § 1114 (attempting to kill federal officers) and § 924 (using weapons in drug trafficking).  A copy of the federal arrest warrant in Case No.

1:04CR0013 is attached hereto as Ex. C.  Following jury trials, Waller and Ervin were found guilty of the following federal charges: Waller was found guilty of car-jacking, carrying and using a firearm during and in relation to a car-jacking, attempting to murder FBI Agents Riolo, Brunswick and McBride and carrying and using a weapon in relation to the attempted murder of a federal officer. (Ex. D attached hereto, verdict form).  Ervin was found guilty of car-jacking, the weapons' charges and carrying/using a firearm in relation to a crime of violence - - specifically the attempted murder of a federal officer or using a deadly weapon to resist, oppose or impede a federal officer.  (Id.)  These verdicts were upheld on appeal.  United States v. Ervin, Nos. 05-3374, 3375, 2006 WL 3791300, at *1 (6th Cir. Dec. 26, 2006) (Ex. E attached hereto.)

The state of Ohio charged Waller and Ervin with various crimes including Lester's murder.  In the state proceedings,  Waller and Ervin were found guilty of felony murder with respect to Lester as well as kidnaping, aggravated robbery, grand theft motor vehicle, six counts of felonious assault with respect to the federal agents (including Werth) and carrying concealed weapons.  These verdicts were upheld on appeal. See, State v. Ervin, No. 87333, 2006 WL 2507563, at * 3 (Ohio Ct. App. Aug. 31, 2006) (Ex. F attached hereto); State v. Waller, No. 87279, 2006 WL 2692590, at 1 (Ohio Ct. App. Sept. 21, 2006)(Ex. G attached hereto.)

### III. ARGUMENT AND LAW

The Complaint generally avers negligence and specifically alleges: (1) that O'Roarke and Vogt failed to inform SWAT members that Lester would be present in the kidnapers' vehicle and planned the stop of the kidnapers' vehicle based thereon (Compl. ¶ 36-44); and (2) that Werth

9

fired through the drivers' window without just cause. (Compl. ¶ 47-49).[4]  As set forth fully herein, the discretionary function exception to the FTCA jurisdictionally bars Plaintiffs' claims based upon the investigation and planning of the hostage-kidnaping situation at issue.  Alternatively and with respect to the shooting of Lester, such claims fail to state a claim under Ohio law and, even if they are deemed sufficient to state a claim, under the undisputed facts, the United States is entitled to judgment as a matter of law.

A.      THE DISCRETIONARY FUNCTION EXCEPTION TO THE FTCA JURISDICTIONALLY BARS PLAINTIFFS' CLAIMS BASED ON THE <u>INVESTIGATION AND HANDLING OF LESTER'S KIDNAPING.</u>

"The United States, as sovereign, 'is immune from suit save as it consents to be sued . . . and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit'." <u>Lehman v. Nakshian</u>, 453 U.S. 156, 160 (1981) (quoting <u>United States v. Testan</u>, 424 U.S. 392, 399 (1976)(citations omitted)).  The FTCA expressly waives sovereign immunity for the negligent acts of government employees acting within the scope of their employment.  28 U.S.C. § 1346(b).

Where the United States waives its immunity from suit, "limitations and conditions upon which the Government consents to be sued must be strictly observed, and exceptions thereto are not to be implied." <u>Lehman</u>, 453 U.S. at 161 (quoting <u>Soriano v. United States</u>, 352 U.S. 270, 276

---

[4] The administrative claim appended to Plaintiffs' Complaint avers that the FBI was negligent in communications regarding Lester's presence in the vehicle, in its overall handling of the "hostage" situation and in discharging a firearm at the hostage. (<u>See</u> Compl. Ex. 2 at p. 6-7).  The FBI requested that procedural deficiencies in the administrative claim be cured, including evidence of valid representation authority, and they were not such that FBI denied the claim. (See attachments to Compl.) This failure to comply with administrative requirements also precludes Plaintiffs' claims.  <u>Kanar v. United States</u>, 118 F.3d 527, 531 (7th Cir. 1997); <u>Blakely v. United States</u>, 276 F.3d 853, 865 (6th Cir. 2002).

(1957)).

Several express jurisdictional exceptions to the FTCA are set forth at 28 U.S.C. § 2680, including, at §2680(a), the discretionary function exception to the FTCA. The statute provides:

> The provisions of this chapter and Section 1346(b) of this title shall not apply to –
>
> (a) Any claim .... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a).

The discretionary function exception serves to protect from suit, those "discretionary acts and functions of government" involving policy judgments and decisions. Rich v. United States, 119 F.3d 447, 450 (6th Cir.1997). Conduct covered by the discretionary function exception is not limited to the policy or planning levels of the Government, but extends to those day-to-day decisions made at an operational level. See, United States v. Gaubert, 499 U.S. 315, 325 (1991).

In determining whether the discretionary function exception applies, the focus is on the nature of the conduct rather than the status of the actor. Burger v. United States, 748 F. Supp. 1265, 1269 (S.D. Ohio 1990). The determination involves a two-pronged test. First, the conduct in question must involve a choice made by the employee. See, Berkovitz by Berkovitz v. United States, 486 U.S. 531, 536 (1988); Montez ex rel. Estate of Hearlson v. United States, 359 F.3d 392, 399 (6th Cir. 2004) (discretionary function exception bars wrongful death action against Bureau of Prisons for failure to ensure safety of murdered inmate); Rosebush v. United States, 119 F.3d 438, 441 (6th Cir. 1997). Thus, "the discretionary function exception does not apply where the federal statute, regulation or policy specifically prescribes the course of action for the

employee to follow so that the employee has no rightful option but to follow the prescribed course." Burger, 748 F. Supp. at 1269 (citations omitted).

Second, assuming the conduct involves an element of judgment, the judgment must be of the "kind that the discretionary function exception was designed to shield." Berkovitz, 486 U.S. at 536. The rationale underlying this limitation is one of preventing second-guessing of "decisions grounded in social, economic, and political policy . . . . A function is discretionary where there is room for policy judgment and decision." Burger, 748 F. Supp. at 1269.

Law enforcement activities are quintessential examples of discretionary functions, since law enforcement personnel must use judgment as to the best course to follow in compelling compliance with criminal statutes and uncovering and deterring misconduct.

> The federal government's decisions concerning enforcement of its criminal statutes comprise part of its pursuit of national policy.
>
> . . . .
>
> Decisions which must be made in [even] run of the mill cases reflect 'judgment reached primarily by balancing the public interest in effective law enforcement against the growing rights of the accused.'

Smith v. United States, 375 F.2d 243, 247 (5th Cir.1967) (citations omitted).

Several courts have specifically determined that law enforcement decisions on how and whether to proceed with investigations are within the exception.[5] See, e.g., Mesa v. United States, 123 F.3d 1435, 1438 (11th Cir. 1997) (an investigation into the "whereabouts and identity of the subject of an arrest warrant prior to service of the arrest warrant" is a discretionary function); Kelly v. United States, 924 F.2d 355, 362 (1st Cir. 1991) ("since decisions to investigate, or not,

---

[5] While Downs v. United States, 522 F.2d 990 (6th Cir. 1975), negatively addressed this issue, United States v. Gaubert, 499 U.S. 315 (1991) abolished the operational versus planning premise upon which Downs was premised, rendering its holding obsolete.

are at the core of law enforcement activity," a Federal agent's decision not to investigate alleged misconduct by a subordinate fell within the exception); Georgia Casualty & Surety Co. v. United States, 823 F.2d 260, 263 (8th Cir. 1987) (the FBI's decision to maintain secrecy in an investigation "involved the balancing of policy considerations protected by the discretionary function exception"); Pooler v. United States, 787 F.2d 868, 871 (3d Cir. 1986) (decisions regarding how an investigation would be pursued, which entailed judgments about how to utilize law enforcement resources, namely informants, fell within the exception).

In Montez, the Sixth Circuit outlined the procedure applicable to determining whether the discretionary function exception applies in a negligence, wrongful death action.  Montez, 359 F. 3d at 395.  In Montez, the inmate-plaintiff was murdered by a fellow-inmate.  First, the court applied Berkowitz and determined that the challenged conduct – the Bureau of Prisons' decisions regarding the safety of Montez –  were not mandatory directives but called for judgment and discretion and were thus shielded by the discretionary function exception.  Id. at 396; see also Burger, 748 F. Supp. at 1269-1274.

The Montez court also noted that several other cases have applied the discretionary function exception to the kinds of government functions challenged by Montez such that the second Berkovitz factor was satisfied.  Id. at 395.

Similarly, in  Flax v. United States, 847 F. Supp. 1183 (D.N.J. 1994), the court considered plaintiff's claim that the FBI was negligent in surveillance of a kidnaping victim.  Specifically, the Flax plaintiff alleged that the responsible FBI agents failed to follow and/or implement FBI procedures and regulations in following and apprehending the assailants.  Id. at 1185-86.   The court rejected this argument and emphasized that the challenged guidelines strongly indicated that

discretion governs several aspects of surveillance and no strict procedures are laid down.  Id. at

1189.  Accordingly, the court held that the FBI agents' conduct was discretionary and shielded by

the discretionary function exception to the FTCA.  Id. at 1190-91; see also, Cole v. United States,

874 F. Supp. 1011, 1046 (D. Neb. 1995) (law enforcement officers' conduct of an investigation --

both what they do and do not do -- is shielded from judicial review as Congress did not intend for

the courts to determine whether such criminal investigative endeavors are negligently conducted);

Marivilla v. United States, 867 F. Supp. 1363, 1382 (N.D. Ill. 1994), aff'd, 60 F.3d 1230 (7th Cir.

1995) (law enforcement agents' alleged negligence or recklessness in planning arrest of suspect

barred by discretionary function exception); Mesa v. United States, 837 F. Supp 1210, 1213 (S.D.

Fla. 1993), aff'd, 123 F.3d 1435 (4th Cir. 1997) (decisions of when and how to execute arrest of

suspect are quintessentially discretionary functions).[6]

Here, as in Montez, Plaintiffs' Complaint specifically challenges as negligent the

---

[6]Several other cases underscore this application of the discretionary function exception to cases like this case. See, e.g.,  Kelly v. United States, 924 F.2d 355 (1st Cir. 1991) (DEA's alleged failure to investigate barred by discretionary function exception); Piechowicz v. United States, 885 F.2d 1207, 1212 (4th Cir. 1989)(decision not to protect witness is police decision barred by discretionary function.) Hydrogen Tech. Corp. v. United States, 831 F.2d 1155, 1160 (1st Cir. 1987) (plaintiff's challenge to FBI investigation as not conducted with due care barred by discretionary function exception); Reeves v, United States Dep't of Treas. Bureau of Alcohol, Tobacco & Firearms,  809 F. Supp. 92, 95-96 (N.D. Ga. 1992), aff'd, 996 F.2d 1232 (11th Cir. 1993) (alleged negligent failure to investigate reports of illegal activity and failure to provide protection to plaintiff barred by discretionary function exception; agents' decisions concerning how to investigate a report of illegal conduct and whether to provide plaintiff protection required policy choices based on the agency's goals and resources); Crow v. United States, 634 F. Supp. 1085, 1089 (D. Kan. 1986) (the discretionary function exception barred plaintiff's claims concerning the planning, preparation and completion of the Postal Inspection Department's undercover investigation of the plaintiff: "The decision on how to investigate, who to investigate and how to present evidence to the proper authorities are classic examples of discretionary conduct.")

communications between FBI agents in New York, Cleveland and the SWAT team and the various decisions made regarding the vehicle stop.  (Compl. ¶¶ 36-44).  The Plaintiffs have not and cannot identify any mandatory directive which governs such communications or the handling of a fluid hostage-kidnaping situation.  Further, the body of case law discussed herein clearly demonstrates that Plaintiffs' negligence claims based on FBI's conducting the kidnaping/hostage investigation and the planning and execution of the arrests for the same are the type of decisions intended to be shielded by the discretionary function exception.  As such, Plaintiffs' claims regarding the investigation and overall planning of the stop are jurisdictionally barred by the discretionary function exception to the FTCA.  See also, Rourke v. United States, 744 F. Supp 100, 102 (E.D. Pa. 1988), aff'd, 909 F.2d 1477 (3d Cir. 1990) (discretionary function exception bars claim based on FBI haphazard investigation resulting in arrest).

It must be emphasized that application of this jurisdictional exception to the FTCA precludes recovery altogether.  United States v. Smith, 499 U.S. 160, 165 (1991).  Moreover, the party asserting jurisdiction has the burden of pleading and proving that the court has subject matter jurisdiction.  McNutt v. Gen. Motors Acceptance Corp. of Ind., 298 U.S. 178, 182 (1936).  Accordingly,  Plaintiffs have the burden to establish that the § 2680(a) exception does not bar their claims.  Baird v. United States, 653 F.2d 437, 410 (10th Cir. 1981) (§ 2680(a) limits waiver of sovereign immunity and therefore poses a jurisdictional prerequisite to suit).

B.  PLAINTIFFS' NEGLIGENCE CLAIMS FAIL AS A MATTER OF OHIO LAW

    1.    Ohio's Wrongful Death Statute Permits Only A Claim By the Estate Administrator: All Other Plaintiffs Should Be Dismissed.

The Ohio wrongful death statute provides:

15

> When the death of a person is caused by wrongful act, neglect, or default which would have entitled the party injured to maintain an action and recover damages if death had not ensued, the person who would have been liable if death had not ensued ... shall be liable to an action for damages, notwithstanding the death of the person injured and although the death was caused under circumstances which make it aggravated murder, murder, or manslaughter.

Ohio Rev. Code § 2125.01.

Only the administrator of an estate can bring a wrongful death claim.  Ohio Revised Code § 2125.02(A)(1) states:

> [A] civil action for wrongful death shall be brought in the name of the personal representative of the decedent for the exclusive benefit of the surviving spouse, the children, and the parents of the decedent, all of whom are rebuttably presumed to have suffered damages by reason of the wrongful death, and for the exclusive benefit of the other next of kin of the decedent.

Attached to Plaintiffs' Complaint are papers appointing "Esther Felicia Priah" as the administrator of the estate of Darnell Lester.  Accordingly, Esther Felicia Priah, administrator of the estate of Darnell Lester, is the only proper Plaintiff in this action and all other Plaintiffs should be dismissed.  See, Ramsey v. Neiman, 634 N.E.2d 211, 213-14 (Ohio 1994) (dismissing wrongful death claim brought by father and grandfather of decedents because he was not the court appointed administrator of the estates); Estate of Bing v. City of Whitehall, Ohio, 373 F. Supp. 2d 770, 773 (S.D. Ohio 2005), aff'd in part, rev'd on other grounds, 456 F.3d 555 (6th Cir. 2006) (dismissing wrongful death claims brought by brother of decedent because he was not the administrator of the decedent's estate).  For all these reasons, Priah is the only proper Plaintiff in this case.

2. The United States Is Immune From Liability For Any
   Negligence Claim Based Upon  Lester's Death or Injury.

Plaintiffs' Complaint sounds entirely in negligence under the FTCA.  Liability under the FTCA is determined in accordance with the law of the place where the act or omission occurred. See, Harris v. United States, 422 F.3d 322, 326-27 (6th Cir. 2005).  Under the FTCA, the United States is liable "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674; United States v. Olson, 546 U.S. 43, 1265 S. Ct. 510, 513 (2005).

The statute expressly provides that the United States shall be entitled to assert any defense based upon judicial or legislative immunity which would have been available to the federal employee whose conduct gave rise to the claim, as well as all other defenses available to the United States.  28 U.S.C. § 2674.  This provision includes state law immunities extended to individual government employees.  Norton v. United States, 581 F.2d 390, 393-396 (5th Cir. 1978) (United States entitled to all defenses of individual officers); Medina v. United States, 259 F.3d 220, 226 n. 2 (4th Cir. 2001); Chin v. Wilhelm, No. CCB-02-1551, CCB-04-4054, 2006 WL 827343, at *8 (D. Md. March 24, 2006)(Ex. H attached hereto) (granting summary judgment to United States on FTCA claims where DEA task force officer entitled to state law immunity which requires showing of malice or gross negligence for individual state officers or employees); accord, Curtis v. Pracht, 202 F. Supp. 2d 406, 417-18 (D. Md. 2002); Tinch v. United States, 189 F. Supp. 2d 313, 317-18 (D. Md. 2002).

Under Ohio law, law enforcement officers, including federal law enforcement officers, are statutorily immune from liability in civil actions for damages for injury and death.  Ohio Rev. Code § 9.88 (federal officers), § 9.86 (state and local officers).  Specifically, Ohio Rev. Code § 9.88 provides that federal law enforcement officers have the same immunity as state or local law

enforcement officers under Ohio law in any civil action for personal injury or wrongful death.[7]

The extent of this immunity is set forth at Ohio Rev. Code § 2744.03(A)(6), defining the immunity of  individual employees of political subdivisions  -  including police officers.  That section provides that police officers are entitled to statutory immunity unless their conduct is wanton, reckless or with a malicious purpose.  Ohio Rev. Code § 2744.03(A)(6).  Under Ohio law, immunity is presumed and the plaintiff must come forward with sufficient evidence to defeat the same.  Cook v. City of Cincinnati, 658 N.E.2d 814 (Ohio Ct. App.1995).  Thus, Plaintiffs must allege and prove wanton, reckless or malicious conduct to defeat the applicable governmental immunity in this case.

These Ohio statutory immunity principles were applied in wrongful death and 42 U.S.C. § 1983 claims arising out of the police's handling of hostage situation in Ewolski v. City of Brunswick, 287 F.3d 492, 510 (6th Cir. 2002).  In Ewolski, a deranged husband was involved in a

---

[7]Similarly, the state of Ohio statutorily waives its immunity to the extent an individual officer would be liable under § 9.86. Ohio Rev. Code § 2743.02(A)(2).  However, this statutory waiver does not apply to "the performance or nonperformance of a public duty." § 2743.02(A)(3)(a). The public duty exception expressly does not apply to actions of the state where a special relationship can be established between the state and an injured party.  A special relationship under this division is demonstrated if all of the following elements exist: (I) An assumption by the state, by means of promises or actions, of an affirmative duty to act on behalf of the party who was allegedly injured; (ii) knowledge on the part of the state's agents that inaction of the state could lead to harm; (iii) some form of direct contact between the state's agents and the injured party; (iv) the injured party's justifiable reliance on the state's affirmative undertaking. Ohio Rev. Code § 2743.02(A)(3)(b).

Similarly, municipal tort liability is statutorily set forth at Ohio Rev. Code § 2744.02 and extends immunity for governmental functions enumerated therein including police services. Ohio Rev. Code § 2744.01(c)(2).  Rahn v. Whitehall, 574 N.E.2d 567, 569 (Ohio Ct. App. 1989).

two-day standoff with police which resulted in his suicide and the murder of his son.  Id.  After finding that the individual officers were entitled to qualified immunity with respect to the excessive force constitutional claim, the court considered plaintiff's state law wrongful death claim, holding that the standard to defeat an officer's statutory immunity under Ohio Rev. Code § 2744.03(A)(6)(B) requires demonstrating bad faith, wanton or reckless conduct.  Id. at 517. The Ewolski court noted that the standard for recklessness employed by Ohio courts holds that "[t]he actor's conduct is in reckless disregard of the safety of others if... such risk is substantially greater than that which is necessary to make his conduct negligent." Id. (citing Fabrey v. McDonald Village Police Dep't, 70 Ohio St. 3d 351, 639 N.E.2d 31, 35 (1994)); see also, Kendzierski v. Carney, No. 22739, 2005 WL 3482397, at *3 (Ohio Ct. App. Dec. 21, 2005) (Ex. I attached hereto) (mere negligence is not converted into wanton misconduct unless evidence establishes tortfeasor has conscious disposition to perversity - granting summary judgment in favor of off-duty sheriff's deputy who shot decedent while decedent was breaking into his home).

Here, the FBI agents who conducted the investigation and felony vehicle stop in question - - including Werth - - are federal law enforcement officers who were in the course of investigating a criminal kidnaping and making arrests.  Plaintiffs do not and cannot allege that any of the agents' conduct was reckless, wanton or undertaken in bad faith.  Indeed, as noted by the Sixth Circuit in the appeal of Ervin and Waller's criminal convictions, Werth shot at Ervin, the driver of the Jimmy, because the vehicle was headed his way and he feared for his life and the safety of the other officers.  United States v. Ervin, 2006 WL 3791300, at * 5 (6th Cir. Dec. 26, 2006).  (See also, Werth Tr. at 591-611.)  These shots were fired in accordance with his duties as a law enforcement officer, the FBI's deadly force policy, constitutional law principles and in good faith.

(See Kirwan Tr. at 19-20, 34-35; Hopper Tr. at 473-74; Werth at 604).

Moreover, it is well-established that a threatened law enforcement officer may respond with deadly force to the driver of a vehicle being used as a weapon.  See e.g., Brosseau v. Haugen, 543 U.S. 194, 200 (2004) (upholding shooting disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight); Dudley v. Eden, 260 F.3d 722, 727 (6th Cir. 2001) (affirming dismissal of civil rights action holding that, given bank robber's refusal to comply with the commands of armed policemen, his attempt to evade arrest, and his reckless driving, it was reasonable for officer to conclude that robber posed a serious threat to himself and others); Smith v. Freeland, 954 F.2d 343, 347 (6th Cir. 1992) (affirming dismissal of civil rights action stating that "[w]e must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day.... [A] car can be a deadly weapon."); Harris v. Coweta County Ga., 406 F.3d 1307, 1315 (11th Cir. 2005), cert. granted, 127 S. Ct. 468 (2006) ("Like other instrumentalities, the use of an automobile cannot be construed in every circumstance as deadly force.  However, an automobile, like a gun, can be used deliberately to cause death or serious bodily injury."); Drewitt v. Pratt, 999 F.2d 774, 776 (4th Cir. 1993) (officer reasonable in shooting at car that sped at him to protect his own safety); Beasley v. Piekutowsky, No. 4:02CV00823, 2005 WL 1463485, at *7 (E.D. Mo. June 21, 2005)(Ex. J hereto) ("If a suspect attempts to run over an officer with an automobile, that automobile becomes a deadly weapon.").

An agent's conduct in accordance with constitutional principles should not, as a matter of public policy, give rise to government liability under state negligence principles.  Under these circumstances, the United States is entitled to the state law immunities of the federal officers and

20

Plaintiffs' claims fail as a matter of law.

      3. <u>Plaintiffs Cannot Demonstrate A Wrongful Death Claim Under Ohio Law.</u>

To maintain a wrongful death action for negligence, a plaintiff must show: (1) the existence of a duty owed to plaintiff's decedent; (2) a breach of that duty; and (3) proximate causation between the breach and the decedent's death. <u>Hitch v. Ohio Dep't of Mental Health</u>, 683 N.E.2d 38, 44 (Ohio Ct. App. 1996); <u>Armstrong v. Best Buy Co., Inc.</u>, 788 N.E.2d 1088, 1091 (Ohio 2003). Even if the statutory immunity discussed in Section 1 is not applied, Plaintiffs have not alleged and cannot demonstrate the elements of a negligence claim and their claims fail as a matter of law.

Under Ohio law, an investigating police officer does not owe an affirmative duty to the subject of his or her investigation or arrest: Ohio courts do not recognize a cause of action for negligence in investigation or arrest, and liability will not attach under general negligence principles.[8] <u>See</u>, <u>Brewer v. J.C. Penney Co.</u>, C.A. No. 2523, 1977 WL 198894, at *2 (Ohio Ct. App. June 15, 1977) (Ex. K attached hereto) (noting that Ohio law does not establish a cause of action for negligent arrest and imprisonment as distinguished from false arrest and imprisonment); <u>see</u> <u>also</u>, <u>Jewell v. City of Columbus</u>, 485 N.E. 2d 266, 268 (Ohio Ct. App. 1984) (rejecting a plaintiff's negligence claim arising out of the incomplete investigation of a traffic accident, and concluding that no duty was owed to the plaintiff to investigate the accident properly).

Additionally, although Ohio courts have adopted Restatement 2d Torts § 323 as a part of a

---

    [8] Ohio's "good Samaritan" statute is inapplicable here because it applies only to those administering emergency care or treatment. Ohio Rev. Code § 2305.23.

21

Good Samaritan doctrine,[9] for § 323(a) to be met, "the defendant's negligent performance must somehow put the plaintiff in a worse situation than if the defendant had never begun the performance."  Wissel v. Ohio High School Athletic Assoc., 605 N.E.2d 458, 465 (Ohio Ct. App. 1992) (quoting Patentas v. United States, 687 F.2d 707, 716 (3rd Cir. 1982)); see also,  Conte v. Gen. Housewares Corp., 215 F.3d 628, 636 n. 5 (6th Cir.2000).  Moreover § 323(b) expressly requires demonstrating reliance based on specific actions or representations which cause the person to forego other alternatives of protecting themselves.  Wissel, 605 N.E. 2d at 465-66;

 Myers v. United States, 17 F.3d 890, 901-03 (6th Cir. 1994) (government not liable for a mine explosion because it had not expressly undertaken to render services nor did detrimental reliance exist).[10]

Courts have routinely rejected wrongful death claims asserting liability based upon special relationship or good Samaritan principles because the government - -  including law enforcement officers - - as a matter of public policy, act in the public's interest and not in the interest of individuals.  Vaughn v. United States, No. 96-6336, 1997 WL 809911, **3-4 (6th Cir. Dec. 16, 1997)(Ex. L attached hereto) (under Kentucky law, FBI not liable for negligent wrongful death

---

[9]Specifically, Restatement 2d Torts § 323 states:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
> (a) his failure to exercise such care increases the risk of such harm, or
> (b) the harm is suffered because of the other's reliance upon the undertaking.

[10] These standards parallel the special relationship duty applicable to the state of Ohio codified at Ohio Rev. Code § 2743.02(A)(2), discussed above.

22

where FBI informant shot plaintiff: no duty to plaintiff based on public policy and no special relationship duty); Guccione v. United States, 847 F.2d 1031, 1037 (2d Cir. 1988) (no duty to individual regarding conduct of undercover investigation absent express, affirmative undertaking and justifiable reliance: FBI's duty is to protect the public); Abernathy v. United States, 773 F.2d 184, 190 (8th Cir. 1985) (no duty or special relationship to protect individuals from outbursts of accused assailant).

Instead, courts have indicated that the United States may incur liability for injuries under general negligence principles only if the United States has expressly promised to provide protection. Merced v. United States, 856 F. Supp. 826, 831 (S.D.N.Y. 1994). In Merced, the district court acknowledged that the government's failure to protect an informant could give rise to liability only upon an affirmative showing that DEA agents had guaranteed his protection. Merced, 856 F. Supp. at 831.

Here, Plaintiffs have not alleged and cannot demonstrate that a duty was assumed. Myers, 17 F.3d at 901 (citing Restatement 2d Torts §§ 314, 321-324A.) It simply cannot be asserted that FBI undertook its course of action solely for the benefit of Lester: In executing the felony vehicle stop, it acted to prevent the commission of crimes whether they be related to drugs, weapons or kidnaping. Any incidental benefit Lester derived would not satisfy the requirement that FBI acted for his benefit. Barnes v. United States, 448 F. 3d 1065, 1067 (8th Cir. 2006) (public purpose motivated government conduct - good Samaritan principles do not apply); Fla. Auto Auction of Orlando v. United States, 74 F. 3d 498, 504-05 (4th Cir. 1996) (no good Samaritan liability for customs enforcement); Mafidge v. United States, 893 F. Supp. 691, 702, (S.D. Tex. 1995), aff'd,189 F.3d 466 (5th Cir. 1999) (government drafting deed not for other's benefit - good

23

Samaritan principles inapplicable).

Further, Plaintiffs cannot demonstrate increased risk.  It is clear that Lester was already in a very dangerous situation prior to any intervention by the FBI.  Lester's friends testified that Ervin and Waller were heavily armed and that they had beaten Lester nearly or to the point of unconsciousness when the kidnaping ensued.  See, State v. Ervin, 2006 WL 2507563 at *1-2; United States v. Ervin, 2006 WL 3791300, at *5.  Additionally, O'Roarke testified that his brief conversations with Lester as the kidnaping dragged on through the early morning became "more urgent" and that Lester "began to lose some composure and began to sound increasingly nervous." (O'Roarke Tr. at 328).  Furthermore, Ervin and Waller were convicted of felony-murder at trial, and the state and federal courts of appeals expressly found that Ervin and Waller were responsible for the situation and Lester's death.  State v. Ervin, 2006 WL 2507563 at *4 (Ervin and Waller "set in motion a chain of events in which one of the reasonably foreseeable consequences was the death of Lester."); United States v. Ervin, 2006 WL 3791300 at * 5 ("Darnell Lester died because of Ervin's actions).[11]  Under these circumstances, Ervin and Waller placed Lester in a very dangerous situation and FBI's efforts "put decedent in no worse position than he would have been had the services not been provided." Power v. Boyles, 673 N.E.2d 617, 621 (Ohio Ct. App. 1996).

Finally, as to detrimental reliance, Plaintiffs cannot demonstrate that Lester abandoned other rescue alternatives in reliance on the FBI.  There is simply no evidence that Lester

---

[11]In the sentencing following their convictions of murdering Lester in state court, Judge Donnelly emphasized that Ervin drove his car directly at Werth, causing him to fire at the vehicle and also emphasized that Ervin and Waller, not the FBI, were responsible for the death of Lester. See state Tr., Ex. B at 1730-37 .

24

abandoned any other available opportunities "to protect himself against the risk" associated with the abduction by Ervin and Waller. Power, 673 N.E.2d. at 622. Indeed, O'Roarke expressly advised Lester to try to free himself if he could. (O'Roarke Tr. at 317). Nor can Plaintiffs show that any alleged reliance would be reasonable since Lester was a seasoned drug dealer familiar with drug-related crimes. (Id. at 309-310). The Plaintiffs, therefore, cannot show detrimental reliance on the FBI's conduct.

For all these reasons, even if this Court asserts jurisdiction over the discretionary conduct of FBI, and/or finds state law immunities do not apply, any of Plaintiffs' remaining negligence claims fail as a matter of law.

4. The Government Cannot Be Liable For Negligently Causing Lester's Injury or Death Because Werth's Conduct Was Privileged And He Acted in Self-Defense.

Under Ohio law, self-defense is available to a police officer defending a civil suit for wrongful death. Specifically, when effecting a lawful arrest, a police officer is under no obligation to retreat. Fields v. Dailey, 587 N.E.2d 400, 406 (Ohio Ct. App. 1990); see also, Estate of Bing, 373 F. Supp. 2d at 785. The elements required to establish self-defense are:

> (1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger.

State v. Barnes, 759 N.E.2d 1240, 1244 (Ohio 2002).

A defendant may be relieved of liability for tortious conduct arising from the use of deadly force by demonstrating that such conduct was in self-defense. Goldfuss v. Davidson, 679 N.E.2d

25

1099, 1105 (Ohio 1965); Ashford v. Betleyoun, No. 22930, 2006 WL 1409793, at 2 (Ohio Ct. App. May 24, 2006) (Ex. M attached hereto) (private security guard justified in using deadly force to shoot and kill assailant who was trying to rob him).

Here, the FBI did not create Lester's situation, since it was created when Ervin and Waller beat and kidnaped Lester.  United States v. Ervin, 2006 WL 3791300 at *5. The Sixth Circuit expressly noted that Werth shot at Ervin because he had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape was the use of force as Ervin was driving the vehicle at him: "Ervin's attempt to run down the FBI agent caused the agent to shoot in self defense." Id.  (See also, Werth Tr. at 601; Kirwan Tr. at 34).  Finally, Agent Werth had no duty to retreat or avoid the danger.  Fields, 587 N.E.2d at 406; Skinner v. Brooks, 58 N.E.2d 697, 698 (Ohio Ct. App. 1944).  Therefore, self-defense justifies Werth's actions in firing upon Ervin.[12]

Similarly, Ohio recognizes that a privilege can exist for actions done in furtherance of the prevention of crime or felony or in response to an emergency.  A person "who otherwise would be liable for a tort is not liable if he acts in pursuance of and within the limits of a privilege." Schultz v. Elm Beverage Shoppe, 533 N.E.2d 349, 351 (Ohio 1988) (quoting Restatement of the Law 2d, Torts (1979) 355, § 890.)  "Conduct that would otherwise be actionable is held to be privileged as a matter of law where, under the circumstances, it furthers an interest of social importance.  Id.

---

[12]See also, Strother v.Hutchinson, 67 Ohio St.2d 282 (1981); Miller v. McAllister, 169 Ohio St. 487, syllabus at ¶ 6 (1959) (the "emergency doctrine" applies to preclude a negligence action where a sudden and unexpected occurrence of a transitory nature demands immediate action - without time for reflection or deliberation).

26

Here, Werth's shooting at Ervin was privileged, done in self-defense and to prevent a felony threatening death or serious bodily harm.  Werth never shot at Lester but shot only at the driver of the vehicle which was headed at him and the vehicles of several other agents.  His shooting was wholly unrelated to whether or not Lester was in the vehicle, as Werth stated his conduct would not have changed had he known Lester was in the vehicle. (Werth Tr. at 609-11). Moreover, Werth could not have realized, in the exigency of the circumstances, that his conduct created a risk of harm to Lester because he was not aware of the identity of the occupants of the vehicle.  Schultz, 533 N.E.2d at 351.

IV. CONCLUSION

Based on the foregoing, the Complaint should be dismissed for want of subject matter jurisdiction and because it fails to state a claim for relief under state law.  Alternatively, because no genuine issues of material fact exist, the United States is entitled to judgment as a matter of law.

Respectfully submitted,

GREGORY A. WHITE
United States Attorney

By:     s/Lynne H. Buck
        Lynne H. Buck
        Assistant U.S. Attorney
        Reg. No. 14166
        801 West Superior Avenue
        Suite 400
        Cleveland, Ohio 44113
        (216) 622-3712
        Fax: (216)522-4982
        E-Mail:lynne.buck@usdoj.gov

27