IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| FELICIA PRIAH, et al. | ) | CASE NO.: 1:06 CV 2196 |
| | ) | |
| Plaintiffs, | ) | JUDGE BOYKO |
| | ) | |
| vs. | ) | |
| | ) | **PLAINTIFFS' CIV. R. 56(F)** |
| UNITED STATES OF AMERICA, et al. | ) | **MOTION FOR DISCOVERY** |
| | ) | **PRIOR TO RULING ON CERTAIN** |
| Defendants. | ) | **PORTIONS OF DEFENDANTS'** |
| | ) | **MOTION DISMISSING AND/OR** |
| | ) | **FOR SUMMARY JUDGMENT** |

Now come Plaintiffs, by and through undersigned counsel, and, pursuant to Rule 56(F) of the Federal Rules of Civil Procedure, respectfully request that the "discretionary function" immunity and "reliance" sections of Defendant's Motion to Dismiss and/or for Summary Judgment be held in abeyance pending necessary discovery as set forth more fully herein.

I. **PRELIMARY STATEMENT**

This motion is being filed <u>prior to</u> Defendants' re-filing of its Motion to Dismiss and/or For Summary Judgment. For sake of this motion, Plaintiffs will assume that Defendants' motion is substantially the same and contains substantially similar arguments. To the extent that new arguments are raised, Plaintiffs may have to file additional briefs regarding new arguments raised.

II. **STATEMENT OF FACTS**

Defendant, in its initial motion, set forth many of the pertinent facts, however, Plaintiff believes that some additional factual background is necessary. After Special Agent O'Rourke had been contacted by Darnell Lester and was well aware of what was happening, the initial FBI plan was to

merely apprehend the kidnappers that showed up at the exchange point (Tr. 325 relevant portions attached hereto as Exhibit 1). Because Cleveland supervising Agent Stephen Vogt only had four agents, two of whom recently had knee surgery, Agent Vogt did not want to do a "car stop" (Tr. 381). At that time, the FBI agents believed that Darnell Lester <u>would not</u> be in the vehicle (Tr. 381). **It was the FBI's idea for Darnell Lester be present in the vehicle** (Tr.325). The FBI's stated reason for asking Darnell Lester to be in the vehicle, unbelievably, was that the FBI believed that Darnell Lester would be <u>safer</u> if he was present in the vehicle (Tr. 326).

After the FBI formulated its plan to have Darnell Lester in the vehicle, S.A. O'Rourke called Darnell Lester and the kidnappers and <u>required</u> that Darnell Lester had to be in the vehicle with the kidnappers at the exchange point (Tr. 326). S.A. O'Rourke received confirmation, at least by 1:07 a.m., that Darnell Lester would accompany the kidnappers in the vehicle (Tr. 351; 352-353). S.A. O'Rourke communicated this to Cleveland FBI S.A. Vogt, who also understood that Darnell Lester would be in the vehicle (Tr. 397-398).

It was the Cleveland FBI and S.A. Vogt who then called out the SWAT Team, which was led by S.A. Kirwan (Tr. 384). Swat Team Leader S.A. Kirwan received a briefing from S.A. Vogt, who had full knowledge that Darnell Lester <u>would be present</u> with the kidnappers in the vehicle (Tr. 384). It is undisputed, however, that **S.A. Vogt forgot to tell S.A. Kirwan and the SWAT Team the critical fact that Darnell Lester would be present in the vehicle**. The FBI SWAT Team members all confirm that they understood that Darnell Lester <u>would not</u> be in the vehicle (Tr. 555; 498; 587-588). FBI SWAT Team Agents Platt, Hopper, Werth and Kirwan all confirmed this fact. (*Id.*). S.A. Werth described the information conveyed to the SWAT Team as "sketchy" (Tr. 583). In fact, S.A. Werth, who fired the fatal shot at Darnell Lester, did not even know what the SWAT

2

Team was doing. He testified that he was not sure if it was a vehicle stop or an entry into a home (Tr. 583).

Ultimately, the FBI SWAT Team made the decision to "jump" the kidnappers' vehicle. It should be noted that S.A. O'Rourke, in New York, expressed his reservations about that plan to S.A. Vogt in Cleveland, however, since the Cleveland FBI was in charge of rescuing Mr. Lester, Cleveland's decision stood (Tr. 349-350).

Upon confirmation that the kidnappers' vehicle was present at Rally's, S.A. Kirwan ordered all of the SWAT vehicles to converge into the Rally's parking lot and contain the GMC Jimmy. At that time, approximately six FBI vehicles entered the Rally's parking lot. S.A. Werth was riding in one of those vehicles, however, it was not the first vehicle to arrive. The first vehicle to arrive was occupied by S.A. Satterfield and Butrey (Tr. 521-527). Prior to any other vehicles being present, S.A. Satterfield and Butrey entered the Rally's parking lot and pulled directly forward of the kidnappers' vehicle (Tr. 527-530). The kidnappers' vehicle started to drive away from the scene at that time and before Agent Werth's vehicle was even in the parking lot (Tr. 529-530). After the kidnappers' vehicle moved forward, for a brief period of time, it stopped (Tr. 529). S.A. Satterfield testified that each vehicle "sat for a moment" (Tr. 529).

S.A. Satterfield testified that as the other FBI vehicles "got closer," the kidnappers started to flee the scene (Tr. 530, Lines 10-11). S.A. Satterfield moved his vehicle to attempt to block the kidnappers from escaping (Tr. 530). At that point, the kidnappers' vehicle backed into his original spot (Tr. 530). The kidnappers' vehicle then pushed past S.A. Satterfield's vehicle on the passenger side (Tr. 531).

S.A. Satterfield testified that "it was apparent that he [kidnappers] was going to try to depart the area by driving to his right" (Tr. 530). The significance of this is that it was clear, prior to the

3

arrival of the other FBI vehicles and S.A. Werth, the kidnappers were not "compliant," but rather were clearly attempting to flee the scene.

S.A. Werth arrived shortly thereafter and was sitting in the rear driver's seat of his vehicle. Agent Werth testified as to when it is appropriate for an FBI agent to exit a vehicle during such a situation. Specifically, he testified that FBI standard operating procedure dictates that an agent should remain in the vehicle until the vehicle they are "jumping" is "compliant." (Tr. 590-591). S.A. Werth defined "compliant" as:

> When we conduct a felony car stop, they fall into somewhat different categories, compliant versus non-compliant. Our whole effort of doing a car stop is to put the individuals in a position where they're going to be compliant. They're going to listen to what we're telling them to do. They're going to show us their hands. . . . we're going to render the situation safe to make a situation compliant.

(Tr. 590). Agent Werth continued by testifying that once the vehicle is "compliant," they exit the vehicle and "bring their weapons up" (Tr. 590-591).

At the time that S.A. Werth exited his vehicle, other agents confirmed that the kidnappers' vehicle was not "compliant" (Tr. 526-532; 484). As a result, S.A. Werth violated FBI policy and placed himself in an allegedly dangerous situation. Further, S.A. Werth did not let any other FBI agents know that he was exiting the vehicle (Tr. 485). There was not specific agreement among the FBI agents as to when they should or should not exit the vehicle (Tr. 498).

After S.A. Werth exited his vehicle, the kidnappers apparently broke the containment of the FBI vehicle that had surrounded it. S.A. Werth, at that time, opened fire on the vehicle. He apparently claims that this was done in self-defense, however, the facts indicate that this could not be true.

4

S.A. Werth admitted that, before ever firing a shot, the kidnappers' vehicle was driving <u>past him</u>, not at him. S.A. Werth admitted that, <u>prior to firing any shots</u>, he made eye contact with the driver of the vehicle through the <u>side driver's window</u> (Tr. 652). It was right while S.A. Werth was looking through the driver's window that the first shot was fired (Tr. 652). If S.A. Werth was looking through the driver's side window, the vehicle had to be driving past him, not at him. S.A. Werth testified that the first shot hit the driver of the vehicle in the head. This shot was taken at approximately a 45 degree angle in relation to the vehicle as it drove past him.

The second shot was taken at approximately a 90 degree angle or when S.A. Werth was perpendicular to the kidnappers' vehicle (Tr. 607). It was the second shot that was the fatal shot to Darnell Lester (Tr. 609). S.A. Werth continued to fire a third shot which was approximately perpendicular to the vehicle and perhaps at an even greater angle (Tr. 609). S.A. Werth admitted that <u>all three shots went through the driver's side window and not windshield</u> (Tr. 594). S.A. Werth seemingly changed his justification for the second and third shots by stating that he believed that his shots were necessary to protect other agents in the area (Tr. 637). S.A. Werth, however, did not see any other agents in the area at the time the shots were fired (Tr. 637). In fact, S.A. Werth admitted that the second and third shots were fired when the vehicle was <u>not coming at him</u> (Tr. 638). It is impossible for S.A. Werth to have been protecting other officers with the second (fatal shot) and (third shot) when there were not other agents around who had exited their vehicles (Tr. 637). Further, there were not automobiles in the direction of his shots that were fired (Tr. 637-638).

**III.  <u>ISSUES WHICH PLAINTIFFS ARE ENTITLED TO DICOVERY, PURSUANT TO CIV. R. 56(f), PRIOR TO THIS COURT'S RULING</u>**

The Defendant has alleged that it is entitled to immunity because its actions relating to Darnell Lester, at least in part, were "discretionary." Defendant asserts that it is entitled to

5

"discretionary function" immunity if there were no applicable mandatory statutes, regulations or policies which subscribe a course of action for the employee to follow (See Plaintiff's initial Brief, pp. 11-12). Defendant further asserted previously that "the Plaintiffs have not and cannot identify any mandatory directive which governs such communications or the handling of a fluid hostage – kidnapping situation." (Defendant's initial Brief, p. 15). It should be further noted that the government may regulate conduct sufficiently to prohibit the application of the "discretionary function" immunity if it has any comprehensive regulatory schemes, administers agency programs or establishes internal operating guidelines. *U.S. v. Gaubert* (1991), 499 U.S. 315.

It is the Plaintiff's position that they should be entitled to discovery on what the applicable policies, rules, regulations and other documents which may arguably form a mandatory course of conduct sufficient to rebut Defendant's "discretionary function" immunity or arguments related thereto.

Defendant has also asserted that the FBI and its agents owed no duty to Darnell Lester because Darnell Lester did not "rely upon" the FBI's rescue efforts (Plaintiff's initial Brief, pp. 21-25). Throughout the course of the evening, Plaintiff does have sufficient evidence to show that Darnell Lester placed approximately thirty (30) telephone calls to the FBI. Plaintiff believes that discovery relating to all other telephone calls made by Darnell Lester (or lack thereof) is critical to the issue of Mr. Lester's "reliance." Specifically, if Darnell Lester ceased making telephone calls to anyone else other than the FBI once he began his communications with the FBI, this would show that he was, in fact, "relying" on the FBI as his sole avenue for safety.

Rule 56(F) of the Federal Rules of Civil Procedure provides as follows:

> Should it appear from the affidavits of a party opposing the motion for summary judgment that the party cannot for sufficient reasons stated present by affidavit facts essential to justify the party's

6

> opposition, the court may refuse the application for judgment or may order a continuance to permit. . . discovery to be had or may make such other order as is just.

For the reasons set forth above, and as contained in the affidavit of Daniel R. Haude, attached hereto as Exhibit 1, Plaintiffs have "sufficient reason" which would mandate that the court hold certain portions of Defendants' Motion to Dismiss and/or For Summary Judgment in abeyance until appropriate "discovery be had" by the Plaintiffs.

IV.   **DOCUMENTS REQUESTED**

Defendant is claiming only discretionary function immunity as it relates to communications between agents and general handling and planning of the hostage situation and <u>not</u> S.A. Werth's use of deadly force.[1] The above list, therefore, is geared towards discovery solely at the issue that Defendant is claiming "discretionary immunity" for.

Plaintiffs believes that the following documents should be produced by the Defendant to the Plaintiffs prior to any ruling on the portions of Defendants' Motion to Dismiss and/or For Summary Judgment. Specifically, the following documents which relate to, reference or mention any rules, policies, protocols, training, advisories, requirements, directives, memos or the like which address, in anyway, the following:

> 1.   <u>Handling of hostage situations by FBI agents and FBI SWAT Team</u> – Handling of hostage situations is relevant because it is reasonably calculated to lead to the discovery of admissible evidence regarding how agents communicate with one another, the necessary information which should be gathered, itemizes necessary information and generally sets forth the parameters for how the FBI should approach such a situation. It is Plaintiff's claim that the FBI and the SWAT Team, despite ample time to do so, neglected to ascertain and/pass along to one another critical information which would specifically affect their "plan of action" on how to approach the situation.

---

[1] This was defense counsel's representation to the Court during the telephone status conference held on 2/2/05.

7

2. <u>How the FBI and/or SWAT Team handles a hostage situation, kidnapping, car stops and communications regarding the same.</u> – This relates to Plaintiffs' exact allegations of negligence.

3. <u>Jurisdiction as to when the FBI (as opposing to local law enforcement) should get involved in kidnapping (in-state) and hostage situations (in-state)</u> – this is relevant because it speaks to an "assumption of a duty" by the FBI under circumstances which the FBI, most likely, should not have been involved in the first place. Defendant has further argued the "lack of a special relationship" between Darnell Lester and the FBI. The fact that the FBI may have assumed this duty because Mr. Lester was a confidential informant speaks directly to whether the FBI assumed a duty which it may not ordinarily have had.

4. <u>Responsibilities of the FBI for confidential informants who may get themselves into a dangerous situation and need assistance.</u> – This is reasonably calculated to lead to evidence on whether the FBI and SWAT Team handled the subject situation.

5. <u>Blocking-in vehicles during a traffic stop</u> – this speaks to the information necessary and/or planning, communications and general protocol which may or may not have been followed by the FBI agents as they organized the kidnapping and failed to factor in that Darnell Lester would be present in the kidnappers' vehicle.

6. <u>When car stops should involve a "jumping" situation</u> – This speaks to what factors the FBI should or should not have considered, including potential communications and sharing of strategy decisions, relating to the situation involving Mr. Lester's death.

7. <u>Extricating a confidential informant from a dangerous situation</u> – All notes of FBI agents who were involved in discussions, planning or implementation of the FBI's strategy and plan to rescue Darnell Lester. This speaks to the information which was obtained and shared (or not shared) between the FBI and the SWAT Team, which is one of the Plaintiffs' allegations of negligence herein.

8. <u>Documentation of any communications between FBI agents or SWAT Team members during the entire incident</u> – See No. 1 above.

9. <u>All tape recorded communications between FBI agents and/or SWAT Team members during the entire incident</u>. – See No. 1 above.

10. <u>All cellular telephone records involved in the Darnell Lester incident (Lester, kidnappers, O'Rourke, Vogt)</u> – This specifically goes to the timing of any communications, the length of any communications and speaks to the FBI and its agents had ample time to communicate certain facts necessary for them to implement an appropriate and safe rescue strategy.

11. All documents relating to suggested communications; evidence, exchange of information during car stops; criminal investigations; "jumping" a stopped vehicle; kidnappings and hostage situations and rescue of confidential informants in danger.

Plaintiff would respectfully point out that Defendant is required by Civ. R. 26 to voluntarily produce all of the above in its initial disclosures, which have not yet been made.

V. **DEPOSITIONS REQUESTED**

Based upon very preliminary information, Plaintiff respectfully submits that they will need the following depositions to respond to the areas of inquiry which are the subject of this 56(F) motion.

1. Certain Civ. R. 30(B)(5) persons who are "most knowledgeable" on the policies set forth above.

2. S.A. Vogt – S.A. Vogt was the Cleveland FBI agent who received information from New York agent S.A. O'Rourke and communicated certain information (and failed to communicate information) to the SWAT Team. S. A. Vogt was in charge of calling out the SWAT Team and was present at the various meetings, staging points with the SWAT Team;

3. S.A. Kirwan – S.A. Kirwan was the leader of the SWAT Team and would have been responsible for conveying necessary information to the SWAT Team members as received from S.A. Vogt. S.A. Kirwan would have been the

9

        point person for communications between S.A. Vogt and the FBI SWAT Team.

4. An identification, pursuant to Civ. R. 30(B)(5), the persons most knowledgeable of the policy information set forth in Section IV above.

## VI. CONCLUSION

For all of the foregoing reasons, Plaintiff respectfully requests that the above discovery is necessary for the Plaintiff to adequately brief and rebut Defendant's allegations in its Motion to Dismiss and/or For Summary Judgment regarding (1) discretionary function immunity; and (2) detrimental reliance by Darnell Lester on the FBI's rescue attempts.

        Respectfully submitted,

        */s/ Daniel R. Haude*
        DANIEL R. HAUDE (0068385)
        **Reminger & Reminger Co., L.P.A.**
        1400 Midland Building
        101 Prospect Avenue West
        Cleveland, OH  44115-1093
        (216) 687-1311; Fax: (216) 687-1841
        dhaude@reminger.com
        *Attorney for Plaintiffs*

## Service

A copy of the foregoing was filed electronically with the Court. Notice of this filing will be sent to all counsel by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Daniel R. Haude
Daniel R. Haude (0068385)