IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

FELICIA PRIAH, et al.         )    CASE NO.: 1:06 CV 2196
                           )
         Plaintiffs,       )    JUDGE BOYKO
                           )
   vs.                   )
                           )    **PLAINTIFFS' BRIEF IN OPPOSITION**
UNITED STATES OF AMERICA, et al. )    **TO FEDERAL DEFENDANT UNITED**
                           )    **STATES' MOTION TO DISMISS OR,**
         Defendants.    )    **IN THE ALTERNATIVE, MOTION**
                           )    **FOR SUMMARY JUDGMENT**
                           )

## I.    STATEMENT OF FACTS

Defendant, in its motion, sets forth many of the pertinent facts, however, Plaintiff believes that some additional factual background is necessary. After Special Agent O'Rourke had been contacted by Darnell Lester and was well aware of what was happening, the initial FBI plan was to merely apprehend the kidnappers that showed up at the exchange point (Tr. 325, relevant portions attached hereto as Exhibit 1). Because Cleveland supervising Agent Stephen Vogt only had four agents, two of whom recently had knee surgery, Agent Vogt did not want to do a "car stop" (Tr. 381). At that time, the FBI agents believed that Darnell Lester <u>would not</u> be in the vehicle (Tr. 381). **It was the FBI's idea for Darnell Lester be present in the vehicle** (Tr.325). The FBI's stated reason for asking Darnell Lester to be in the vehicle, unbelievably, was that the FBI believed that Darnell Lester would be <u>safer</u> if he was present in the vehicle (Tr. 326).

After the FBI formulated its plan to have Darnell Lester in the vehicle, S.A. O'Rourke called Darnell Lester and the kidnappers and <u>required</u> that Darnell Lester had to be in the vehicle with the

kidnappers at the exchange point (Tr. 326). S.A. O'Rourke received confirmation, at least by 1:07 a.m., that Darnell Lester would accompany the kidnappers in the vehicle (Tr. 351; 352-353). S.A. O'Rourke communicated this to Cleveland FBI S.A. Vogt, who also understood that Darnell Lester would be in the vehicle (Tr. 397-398).

It was the Cleveland FBI and S.A. Vogt who then called out the SWAT Team, which was led by S.A. Kirwan (Tr. 384). Swat Team Leader S.A. Kirwan received a briefing from S.A. Vogt, who had full knowledge that Darnell Lester <u>would be present</u> with the kidnappers in the vehicle (Tr. 384). It is undisputed, however, that **<u>S.A. Vogt forgot to tell S.A. Kirwan and the SWAT Team the critical fact that Darnell Lester would be present in the vehicle</u>**. The FBI SWAT Team members all confirm that they understood that Darnell Lester <u>would not</u> be in the vehicle (Tr. 555; 498; 587-588). FBI SWAT Team Agents Platt, Hopper, Werth and Kirwan all confirmed this fact. (*Id.*). S.A. Werth described the information conveyed to the SWAT Team as "sketchy" (Tr. 583). In fact, S.A. Werth, who fired the fatal shot at Darnell Lester, did not even know what the SWAT Team was doing! He testified that he was not sure if it was a vehicle stop or an entry into a home (Tr. 583).

Ultimately, the FBI SWAT Team made the decision to "jump" the kidnappers' vehicle. It should be noted that S.A. O'Rourke, in New York, expressed his reservations about that plan to S.A. Vogt in Cleveland, however, since the Cleveland FBI was in charge of rescuing Mr. Lester, Cleveland's decision stood (Tr. 349-350).

Upon confirmation that the kidnappers' vehicle was present at Rally's, S.A. Kirwan ordered all of the SWAT vehicles to converge into the Rally's parking lot and contain the GMC Jimmy. At that time, approximately six FBI vehicles entered the Rally's parking lot. S.A. Werth was riding in one of those vehicles, however, it was not the first vehicle to arrive. The first vehicle to arrive was

occupied by S.A. Satterfield and Butrey (Tr. 521-527). Prior to any other vehicles being present, S.A. Satterfield and Butrey entered the Rally's parking lot and pulled directly forward of the kidnappers' vehicle (Tr. 527-530). The kidnappers' vehicle started to drive away from the scene at that time and <u>before</u> Agent Werth's vehicle was even in the parking lot (Tr. 529-530). After the kidnappers' vehicle moved forward, for a brief period of time, it stopped (Tr. 529). S.A. Satterfield testified that each vehicle "sat for a moment" (Tr. 529).

S.A. Satterfield testified that as the other FBI vehicles "got closer," the kidnappers started to flee the scene (Tr. 530, Lines 10-11). S.A. Satterfield moved his vehicle to attempt to block the kidnappers from escaping (Tr. 530). At that point, the kidnappers' vehicle backed into his original spot (Tr. 530). The kidnappers' vehicle then pushed past S.A. Satterfield's vehicle on the passenger side (Tr. 531).

S.A. Satterfield testified that "it was apparent that he [kidnappers] was going to try to depart the area by driving to his right" (Tr. 530). The significance of this is that it was clear, prior to the arrival of the other FBI vehicles and S.A. Werth, the kidnappers were not "compliant," but rather were clearly attempting to flee the scene.

S.A. Werth arrived shortly thereafter and was sitting in the rear driver's seat of his vehicle. Agent Werth testified as to when it is appropriate for an FBI agent to exit a vehicle during such a situation. Specifically, he testified that FBI standard operating procedure dictates that an agent should remain in the vehicle until the vehicle they are "jumping" is "compliant." (Tr. 590-591). (Tr. 590). Agent Werth defined "compliant" as (1) is the vehicle going to be stationary and (2) the perpetrators showing their hands (Tr. 618). Agent Werth then testified that once the vehicle is "compliant," they exit the vehicle and "bring their weapons up" (Tr. 590-591).

At the time that S.A. Werth exited his vehicle, other agents confirmed that the kidnappers' vehicle was not "compliant" (Tr. 526-532; 484). As a result, S.A. Werth violated FBI policy and placed himself in an allegedly dangerous situation. Further, S.A. Werth did not let any other FBI agents know that he was exiting the vehicle (Tr. 485). There was not specific agreement among the FBI agents as to when they should or should not exit the vehicle (Tr. 498).

After S.A. Werth exited his vehicle, the kidnappers apparently broke the containment of the FBI vehicle that had surrounded it. S.A. Werth, at that time, opened fire on the vehicle. He apparently claims that this was done in self-defense, however, the facts indicate that this could not be true.

S.A. Werth admitted that, before ever firing a shot, the kidnappers' vehicle was driving past him, not at him. S.A. Werth admitted that, prior to firing any shots, he made eye contact with the driver of the vehicle through the side driver's window (Tr. 652). It was right while S.A. Werth was looking through the driver's window that the first shot was fired (Tr. 652). If S.A. Werth was looking through the driver's side window, the vehicle had to be driving past him, not at him. S.A. Werth testified that the first shot hit the driver of the vehicle in the head (Tr. 629). This shot was taken at approximately a 45 degree angle in relation to the vehicle as it drove past him.

The second shot was taken at approximately a 90 degree angle or when S.A. Werth was perpendicular to the kidnappers' vehicle (Tr. 607). It was the second shot that was the fatal shot to Darnell Lester (Tr. 609). S.A. Werth continued to fire a third shot which was approximately perpendicular to the vehicle and perhaps at an even greater angle (Tr. 609). S.A. Werth admitted that all three shots went through the driver's side window and not windshield (Tr. 594).

S.A. Werth seemingly changed his justification for the second and third shots by stating that he believed that his shots were necessary to protect other agents in the area (Tr. 637). S.A. Werth,

however, did not see any other agents in the area at the time the shots were fired (Tr. 637). In fact, S.A. Werth admitted that the second and third shots were fired when the vehicle was <u>not coming at</u> <u>him</u> (Tr. 638). It is impossible for S.A. Werth to have been protecting other officers with the second (fatal shot) and (third shot) when there were not other agents around who had exited their vehicles (Tr. 637). Further, there were not automobiles in the direction of his shots that were fired (Tr. 637-638).

## II.     LAW AND ARGUMENT

### A.     Pursuant to Rule 56(F) of the Federal Rules of Civil Procedure, Plaintiff need the opportunity to conduct discovery on the discretionary function exception to the FTCA.

One of the Defendants' basis for summary judgment is that the FBI agents were involved in a "discretionary function," which is an exception to the United States waiver of its immunity from suit, thereby warranting summary judgment and/or dismissal of Defendants. Specifically, that Defendant's planning, communications and execution of its purported "rescue" attempts are a "discretionary function." The Defendants' basis is that "the Plaintiffs have not and cannot identify any mandatory directive which governs such communications or the handling of a fluid hostage – kidnapping situation." (p. 15 of Def.'s Brief). In fairness, Plaintiff has not had the opportunity to conduct any discovery or take any depositions which might lead to the identification of any such policy or directive which would govern either the communications between FBI agents and the FBI SWAT Team's use, by S.A. Werth, of deadly force or other policies such as exiting vehicles, handling hostage situations, etc. Defendant makes merely a conclusory statement, without supporting affidavits of proper evidence, that there were no mandatory directives (Defendant's supplemental Brief, p. 5).

The government may govern employee conduct in a variety of ways, including comprehensive regulatory schemes, administration of agency programs and internal operating guidelines. *U.S. v. Gaubert* (1991), 499 U.S. 315. If the government does any of the above, the discretionary function exception is eliminated, thereby mandating that Defendants' motion for summary judgment and/or dismissal be denied. The only way that Plaintiff, in fairness, can identify whether any of the above exists, is to conduct some discovery on those issues.

Rule 56(F) of the Federal Rules of Civil Procedure provide as follows:

> Should it appear from the affidavits of a party opposing the motion for summary judgment that the party cannot for sufficient reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit. . . discovery to be had or may make such other order as is just.

As set forth in the affidavit of Daniel R. Haude, attached hereto as Exhibit 2, Plaintiffs have "sufficient reason" which would mandate that "discovery be had" on.

WHEREFORE, the issue of whether the FBI agents were performing "discretionary functions" entitling them to immunity should be held in abeyance until such time as Plaintiff has had the opportunity to conduct adequate discovery to rebut Defendants' motion for summary judgment and/or for dismissal. This discovery has been outlined in Plaintiff's Rule 56(F) motion (ECF 19).

**B.** **Plaintiff's negligence claims DO NOT fail as a matter of law.**

**1.** **Plaintiff agrees that it would appropriate for the only named Plaintiff to be Felicia Priah, the Administratrix of the Estate of Darnell Lester.**

Plaintiff agrees with the Defendant that, from a technical pleading standpoint, it is appropriate to dismiss all named Plaintiffs except Felicia Priah, as she is the Executrix of the Estate of Darnell Lester. All other named Plaintiffs are still "claimants," under Ohio's wrongful death statute, for the death of Darnell Lester despite the fact that they are not named Plaintiffs. Plaintiff

would respectfully request that this Court craft its journal entry to reflect the fact that the other named Plaintiffs may still have a right to a recovery as "claimants," however, do not have a right to be named Plaintiffs in the suit.

### 2.   The United States is NOT immune from liability on negligence based upon Darnell Lester's death.

The Defendants' argument here is that Plaintiff must prove some higher level of culpability than negligence against the individual FBI agents to prevail against the United States, such as gross negligence or recklessness. As an initial matter, Plaintiffs have alleged, in their Amended Complaint and Second Amended Complaint, gross negligence, recklessness, willful and wanton conduct in addition to negligence. Therefore, Plaintiffs have "alleged" the appropriate level of culpability for liability to be established against the United States, assuming that Defendants' legal arguments are correct. From a factual standpoint, there exists a question of fact as to whether or not the FBI agents' conduct rises to a level greater than negligence.

It is undisputed that the FBI's decision on how it would handle the hostage situation depended upon whether Darnell Lester was in the kidnappers' vehicle (Tr. 349-350). The FBI has admitted that it would handle the situation differently depending on whether Darnell Lester was or was not in the kidnappers' vehicle (Tr. 349-350). Therefore, it cannot reasonably be disputed that the fact of whether Darnell Lester was or was not likely to be present in the vehicle was critical to and central to how the FBI and its agents would handle the situation. Further, it cannot reasonably be disputed that accurate and complete communication between FBI agents, particularly on critical issues, is absolutely necessary for everyone's safety and wellbeing, including the agents and the victim.

The FBI agents had <u>almost five (5) hours</u> to talk among themselves about the critical issues and facts involved in this particular hostage situation. Darnell Lester's initial phone call to S.A.

O'Rourke occurred at approximately 9:00 p.m. on December 22, 2003 (Tr. 311).  At 1:42 a.m. on December 23, 2003, S.A. O'Rourke was still having telephone communications with Darnell Lester (Tr. 397).  Therefore, the FBI agents had more than adequate time to inform the FBI SWAT Team that Darnell Lester was likely to be in the vehicle.

S.A. Vogt was fully aware that Darnell Lester was likely to be in the vehicle with the kidnappers (Tr.397-398).  S.A. Vogt accompanied the SWAT Team to the location (Tr. 388).  In fact, S.A. Vogt actually met with the SWAT Team at 1:10 a.m. personally and, apparently, failed to mention that the victim was likely to be in the vehicle (Tr. 388).

The above establishes a question of fact as to whether the FBI agents' failure to communicate to the FBI SWAT Team that Darnell Lester would be present in the kidnappers' vehicle was negligent, reckless or grossly negligent.  Ordinarily, the determination of whether someone's conduct was negligent, reckless or grossly negligent is a question of fact for the jury to determine.  *Krantz v. City of Toledo Police Dept.* (C.A. 6th Ohio 2006), 197 Fed. App. 446 ("the issue of wanton or reckless conduct is typically a jury question") (citing *Fabrey v. McDonald Village Police Dept.* (1994), 70 Ohio St.3d 351; *Beck v. Haik* (C.A. 6th Mich. 2000), 234 F.3d 1267 ("when reasonable minds can differ, the issue of gross negligence is for the jury"); *Matkovich v. Penn Central* (1982), 69 Ohio St.2d 210 ("wanton misconduct is a jury question"); *Fabrey v. McDonald Police Dept.* (1994), 70 Ohio St.3d 351 ("we agree . . . that the issue of wanton misconduct is normally a jury question").

The second issue involves whether the Plaintiffs can prove S.A. Werth's fatal shooting of Darnell Lester was grossly negligent or reckless.  As set forth above, S.A. Werth fired three shots through the <u>driver's window</u> of the subject vehicle.  That fact, in and of itself, establishes that Agent Werth was not in any physical danger if he was off to the side of the vehicle and looking into the driver's side window.  Agent Werth testified that the first shot was fired at approximately a 45

8

degree angle. But it was the second shot which ultimately killed Darnell Lester (Tr. 609; 630). S.A. Werth admitted that, at the time of the second shot, the kidnappers' vehicle was not coming at him (Tr. 638). Therefore, there seems little, if any, chance that a reasonable jury would believe that S.A. Werth's life was in danger at the time of the second shot so as to justify the use of deadly force. S.A. Werth also admitted that he saw no other agents around who may have been in danger (Tr. 637). The Defendants' argument that "these shots were fired in accordance with his duties as a law enforcement officer, the FBI's deadly force policy, constitutional law principles and in good faith" is clearly without merit (See P. 19 of Def's Brief).

It should be mentioned that Defendants' entire argument for summary judgment and/or dismissal on this issue is based upon the allegation that S.A. Werth feared for his life ("Werth shot at Ervin, the driver of the Jimmy, because the vehicle was headed his way and he feared for his life and the safety of the other officers") (See P. 19 of Def's Brief). The Defendants then seem to argue, without being particularly clear, that Werth's concern was for both himself and for other officers. This argument is also without merit because S.A. Werth readily admitted that, at the time of the second fatal shot, he did not see any other agents in the area who could possibly be in danger (Tr. 637). Specifically, S.A. Werth testified as follows:

> **Answer**: . . . As the vehicle picked up speed and continued out, I was able to move more out of the way. I was firing additional shots because the driver was still, especially, was picking up speed, a threat to other agents in the area that also got out of their vehicles, or I expected to be out of the vehicles.
>
> **Question**: A threat to which other agents in the area?
>
> **Answer**:    Again, I knew that we had somewhere between 15 and 20 agents, several vehicles that were conducting the felony car stop. This vehicle was initially coming towards me had broken containment. I was firing because he was a threat to me and also to other agents in the area.

**Question:** <u>**Did you see any other agents on foot?**</u>

**Answer:** <u>No</u>. My focus was on him.

(Tr. 637).

At the time the second shot was fired (fatal shot to Darnell Lester), Agent Werth admitted that he was out of the way and the vehicle was not coming towards him (Tr. 637-638), so the only possible threat could be to other officers on foot. S.A. Werth readily admits, as set forth above, that he is unable to identify a single agent on foot who could have even possibly been in danger (Tr. 637). This certainly creates a question of fact as to whether S.A. Werth's fatal shooting of Darnell Lester rises to the level of recklessness or gross negligence.

Summary Judgment is inappropriate where there are factual disputes over the reasonableness of the use of deadly force. *Sova v. City of Mt. Pleasant* (6th Cir. 1998) 142 F3d 898, 903; see also *Sample v. Bailey* (N.D. Ohio 204), 337 F.Supp.2d 1012, 1021 (Summary Judgment inappropriate because "whether the police officers' actions were reasonable is contingent on the fact – finders resolution of the relevant factual conflict."). The 6th Circuit in *Sova, supra,* explained why summary judgment is inappropriate on the issue of the reasonableness of the use of deadly force:

> . . . If the jury determines the officer shot the suspect without a reasonable belief that he posed a significant threat of death or serious physical injury to the officer or others, then the officer's actions were legally unreasonable under the Fourth Amendment. . . Where, as here, the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability. This is especially true considering that the district court must view the facts in the light most favorable to the plaintiff on a motion for summary judgment.

*Id.* at 903. Further, it is axiomatic that "only in <u>rare instances</u> may an officer seize a suspect by the use of deadly force." *Sample, supra.*

In *Estate of William Bing v. City of Whitehall Ohio* (S.D. Ohio 2005), 373 F.Supp.2d 770, the court analyzed a very similar issue. In *Bing,* the police received a call that several teenagers and Bing

had been involved in an altercation and that a gun had been fired into the air.  Upon arrival at the scene, police were informed, by the teenagers, that Bing fired a shot at them.  The police went to Bing's house to interview him, but Bing refused to leave his house.

Ultimately, the SWAT Team was called in.  After hours of attempting to get Bing to come out of his home, the SWAT Team broke into his home. While the SWAT Team was in his home, several shots were fired, one of which was a fatal shot to Mr. Bing.  The Estate of Mr. Bing brought a wrongful death claim in federal court in the Southern District of Ohio alleging wrongful death under Ohio state law.  The Defendants argued that the SWAT Team members had a reasonable belief that their life was in danger and, therefore, their shooting of Mr. Bing was justified.

The court denied the summary judgment for the following reasons.  First, the court relied on *Solva, supra,* for the proposition that summary judgment is generally improper where the issue is whether the use of deadly force was reasonable.  Second, the court stated that "the court may not simply accept what may be a self-serving account by the police officer.  It must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational fact finder that the officer acted unreasonably." *Id.* at 781.  Third, in reviewing several factual disputes and several possible different interpretations of the facts, the court determined that summary judgment was improper and that the plaintiffs should be permitted to have a jury determine whether or not the defendant police officer's use of deadly force was appropriate.

The issue was also addressed by the 6th Circuit *Sigley v. City of Parma Heights,* (6th Cir. 2006), 437 F.3d 527.  In *Sigley,* the Parma Heights Police Department was investigating an alleged ecstasy drug dealer named Davis.  The police obtained the cooperation of a confidential informant who arranged a buy-bust operation involving Davis.  The operation involved the confidential informant purchasing ecstasy from Davis.  A meeting place was agreed upon behind a Tops Bar & Grill in

Parma Heights.  An undercover police officer accompanied the confidential informant to meet Davis at this location.

The confidential informant and undercover police officer met Davis behind Tops Bar & Grill and exchanged money for ecstasy.  At that point, the undercover officer in the vehicle signaled for other officers nearby to block Davis' vehicle and prevent him from escaping.  The officers blocked Davis' vehicle, exited their vehicle and yelled "stop, police" and "your under arrest."  Davis then attempted to flee the scene.  He backed his car up to try to break containment.  While doing so, Davis' car made contact with a Parma Heights police officer's hand.  Shortly thereafter, that police officer fired a fatal shot at Davis.

The police officer contended that Davis' behavior caused him to reasonably believe that his life was in danger and, therefore, his shooting was justified by self-defense.  The Plaintiff, however, presented evidence that the Parma Heights police officer took the fatal shot from a position where his life was not in jeopardy.  In fact, Plaintiff produced evidence that Davis' car was driving <u>past</u> the <u>Parma Heights police officer</u> when the shot was fired (identical to this case).

The district court granted the City of Parma Heights and the police officer's motion for summary judgment on the basis that the officer had immunity for his shooting because his use of deadly force was appropriate because he reasonably feared for his life.  The 6th Circuit <u>reversed</u> the district court's granting of summary judgment and determined that "factual disputes" which would preclude summary judgment on the issue of whether the use of deadly force was appropriate.

It should be noted that the United States Supreme Court has stated that "because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, however, its proper application requires careful attention to the facts and circumstances of each particular case."  *Graham v. Connor* (1989), 490 U.S.386, 396.  See also *Brosseau v. Haugen*

(2004), 543 U.S. 194 (stating that analyzing fleeing vehicle cases is an area in which the result depends very much on the facts of the case).

The use of deadly force is also inappropriate where the officer in question unreasonably creates the encounter which ostensibly permits its use. *Estate of Starks v. Enyart* (7th Cir. 1993), 5 F.3d 230. In *Starks, supra,* the police officer stepped in front of a vehicle and, at the same time, claimed that he was reasonably in fear for his life and, therefore, deadly force was justified. S.A. Werth's conduct is very analogous to that discussed in *Enyart, supra.* Agent Werth testified that he is not supposed to exit his vehicle until the vehicle is "compliant." (Tr. 590-591). From the testimony of other agents set forth above, it was very clear that the kidnappers' vehicle was <u>not</u> "compliant" when Agent Werth existed the vehicle (Tr. 526, 532; 484). The kidnappers' vehicle had already made several evasive maneuvers before S.A. Werth's vehicle had even stopped in front of the kidnappers's (Tr. 530). There is certainly a question of fact about whether Agent Werth's conduct, given the above, placed himself in the very danger that he sought to defend himself against with deadly force. This is yet another reason why summary judgment in favor of the Defendants must be denied.

WHEREFORE, there is a question of fact which exists on whether the FBI agent's conduct was grossly negligent and/or reckless and whether S.A. Werth's use of deadly force was reasonable under the circumstances, thereby precluding summary judgment and/or dismissal.

### 3.  Plaintiffs <u>CAN</u> demonstrate a wrongful death claim under Ohio law.

The Defendant has made a number of arguments in support of this particular theory and Plaintiff will attempt to decipher and address each one individually.

### a.  The subject FBI Agents did owe a duty to Darnell Lester.

The Defendant alleges, generally, that the FBI agents did not owe a duty to Darnell Lester. In support of this proposition, Defendant cites *Brewer v. J.C. Penney Co.* and *Jewel V. City of Columbus.*

Neither of these cases stand for that proposition. *Brewer* involved a plaintiff's allegation against J.C. Penney and its security guards and/or agents and <u>did not</u> involve any governmental or law enforcement personnel. The plaintiff in *Brewer* was identified by a J.C. Penney Store employee as an individual who had passed a bad check. Based upon this information, police signed an affidavit charging the plaintiff with forgery. Thereafter, the plaintiff was arrested. As a result of this arrest, he was temporarily suspended from his job and incarcerated for three weeks. The plaintiff instituted the claim of false imprisonment and malicious prosecution. Summary judgment was granted in the trial court and affirmed in the Ninth District Court of Appeals. There are no discussions whatsoever about whether a law enforcement officer owes a victim of a kidnapping a duty not to shoot and kill him. *Id.*

Defendants also rely on *Jewel, supra.* In *Jewel,* the plaintiff was involved in a motor vehicle accident which was investigated by the City of Columbus Police Department. The City of Columbus police officer allegedly did not list the identity of the driver who caused the accident, thereby preventing the plaintiff from discovering who he may be able to sue for injuries and/or property damage. The trial court dismissed the plaintiff's claim of negligent preparation of a traffic report against the City of Columbus. The plaintiff appealed to the Tenth District Court of Appeals. The Tenth District Court of Appeals held that the City of Columbus did not owe a duty in the preparation of an accident report because the duty owed was to the director of highway safety for statistical, safety and other studies, with the objective of providing safer highways. *Id.* This case also sheds no light whatsoever on whether a law enforcement officer owes a duty of reasonable care in attempting to rescue a victim from a kidnapping and/or using deadly force which ultimately kills a victim.

The Plaintiff herein has previously cited and discussed *The Estate of William Bing, supra* and *Sigley, supra.* In both of those cases, the Southern District of Ohio and the Sixth Circuit both held

that law enforcement personnel <u>do owe a duty</u> to those persons involved in a criminal investigation. In fact, not only is there a duty, the law enforcement agencies (City of Whitehall SWAT Team and Parma Height Police) were <u>not</u> entitled to summary judgment.

Given the above, the defendant has not met its burden in identifying applicable law which supports its position. Both the Southern District of Ohio in *Estate of William Bing* and the Sixth Circuit in *Sigley, supra,* unequivocally held that, in Ohio, law enforcement officers <u>do owe a duty</u> not to injure and/or kill those who are involved and/or who are near by a criminal investigation/traffic stop.

> **b.    Defendants also owe Plaintiff's decedent a duty under §323 of the Restatement 2D torts.**

Pursuant to the Restatement 2D torts §323:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other harm resulting from his failure to exercise reasonable care to perform this undertaking, if (a) his failure to exercise such care <u>increases the risk of such harm</u>, or (b) the harm suffered because of the others reliance upon the undertaking.

With regard to prong (a) ("increasing risk of harm"), there can be no question that defendant, through its employees, increased the risk of harm to Darnell Lester. First, the FBI required him to come to the location where he was shot, when initially he was not to be at that location (Tr. 325). Had the FBI not required him to be there he must likely, would not have been killed. Second, SA Werth "increased the risk of harm" to Darnell Lester when he opened fire on the vehicle Darnell was riding in when neither he nor any other agents were in danger. Had S.A. Werth not opened fire, without adequate justification, Darnell Lester would not have been killed on site and would have simply driven a short ways as a passenger and been rescued when the

15

kidnappers' vehicle was pulled over. Third, the FBI's failure to inform the SWAT Team that Darnell Lester would be present in the vehicle "increased the risk of harm" to Darnell Lester because the agents certainly would have exercised some caution before filling the vehicle full of bullets when no one's life was in danger. The above facts create a question of fact on whether the defendant, through its employees, increased the risk of harm to Darnell Lester, thereby giving rise to a duty.

A very similar analysis took place in *City of Cincinnati v. Beretta USA Corp.* (2002), 95 Ohio St.3d 416. In *Beretta*, the City of Cincinnati sued a number of gun manufacturers, including Beretta USA, for negligently manufacturing, marketing, and distributing firearms in a way that created an illegal firearms market in Cincinnati resulting in foreseeable injury. *Beretta*, along with other manufactures, filed a motion to dismiss for failure to state a claim at the trial court level. The trial court granted defendant's motion. The Court of Appeals affirmed.

The Ohio Supreme Court, however, determined that Beretta USA and the other gun manufacturers <u>did owe a duty</u> to the City of Cincinnati. Specifically, the Ohio Supreme Court distinguished the party's failure to control the acts of a third party versus a party affirmatively creating risk by their own conduct. In *Beretta*, the Supreme Court stated:

> . . . the negligence issue before us is not whether appellees owe appellant a duty to control the conduct of third parties. Instead, the issue is whether appellees are themselves negligent by manufacturing, marketing, and distributing firearms in a way that creates an illegal firearms market that results in foreseeable injury. <u>Consequently, the "special relationship" rule is not determinative of the issue presented here</u>. Instead, the allegations of the complaint are to be addressed without resort to that rule.

*Id.* at 422. Ultimately the Ohio Supreme Court ruled that the trial court and Court of Appeals erred in granting a motion to dismiss and that Plaintiffs had stated a claim against the gun manufacturers.

In this case, the FBI's conduct is very analogous to *Baretta*. The FBI agents specifically created risk for Darnell Lester that was not already there by requiring him to come to the location

where the FBI ultimately shot him. Further, the FBI agents began firing shots into the vehicle containing Darnell Lester when he otherwise would have, at least, remained alive but for the FBI. The FBI further created risk for Darnell Lester, after requiring him to come to the incident location, failing to provide the FBI SWAT Team with information that he would be in the kidnappers' vehicle. All of the above actions were initiated by the FBI and significantly increased Darnell's risk of being injured. Because the FBI actually created a greater risk that would otherwise have been present, the requirement of a "special relationship" is not required. *Id.*

With regard to prong (b) ("reliance on FBI"), there also exists a question of fact as to whether Darnell Lester "relied upon" the FBI's undertaking. It is uncontested that Darnell Lester made at least thirty-six (36) calls to the FBI (Tr. 317, 328, 348, 1047-1048, 1052-1054). These calls, throughout the evening, became "more urgent" and Darnell Lester began loosing his composure (Tr. 328). Defendant is in possession of the criminal trial transcripts, both State and Federal, of the kidnappers Ervin and Waller. There is no evidence that Darnell Lester made any other phone calls to any other individuals to help rescue him once he began conversing with FBI agents (See FBI summary of phone records from all phones found in GMC Jimmy, collectively attached hereto as Exhibit 3, authenticated by Stipulation of Authority, attached hereto as Exhibit 4). As one can imagine, why would Darnell Lester seek other avenues of assistance when he has the full force and power of the Federal Bureau of Investigations attempting to rescue him? Who would he call that would afford him a "better option" than the FBI to rescue him?

Defendant cites a single statement made by S.A. O'Rourke to Darnell Lester that he should "try to free himself as he could." (Tr. 317). Mr. Lester, of course, had been unsuccessful during the previous part of the evening, had his hands bound and obviously was in no position to free himself or he would have. He does not need an FBI agent to tell him he should try to free himself if the

17

situation arises.  It is certainly an absurd proposition to suggest that Mr. Lester could have escaped, but remained a captor simply because the FBI was planning to rescue him.  Even if the FBI did not create the original risk (kidnapping), the FBI owed Darnell Lester a duty if its actions "increase the risk" to him beyond what was already present.  *Kallstrom v. City of Columbus* (6th Cir. 1998), 136 F.3d 1055; Restatement of torts (2d) §323.

Based upon the above, there is certainly a question of fact which remains regarding whether or not the FBI "increased the risk" to Darnell Lester by shooting and killing him and placing him and requiring him to be present at the shooting location and whether Darnell Lester "relied" on the promises of protection given to him by the FBI.  The cases cited by the Defendant are wholly unpersuasive.  *Wissel* (Ohio High School Athletic Association did not increase the risk to high school football player by specifying the appropriate football equipment he should wear); *Conte* (Dayton Power & Light Co. did owe a duty to contractor working near power lines when it failed to de-energize power lines); *Myers* (Mine Safety and Health Administration did not increase the risk to mine worker who died in explosion by failing to uncover safety violation during inspections because there was no evidence that mine company relied upon MSHA inspections); *Guccione* (FBI owed no duty to plaintiff who claimed that an FBI informant defamed plaintiff during the course of an FBI investigation); *Vaughn* (FBI owed no duty to two people who were shot at an FBI informant's home during a social party); *Merced* (DEA owed no duty to woman who claimed that NYPD officers, also involved in a DEA Task Force, failed to provide her adequate protection); *Barnes* (Food, Safety & Inspection Service owed no duty to chicken processing plant, under Missouri law, for its investigations of its poultry business which interfered with the business, but rather duty owed to chicken-consuming public); *Florida Auto Auction* (U.S. Customs owed no duty to auto auction to prevent third party from exporting vehicles under South Carolina public-duty rule because Florida

Auto Auction did not rely on U.S. Customs for the protection of their vehicles); *Mafrige* (United States owed no duty to grantor of land conveyance when drafting deed).  On this basis alone, defendant's motion must be denied.

### c.  A "special relationship" did exist between Darnell Lester and the FBI.

The existence of a "special relationship" is but one way of establishing a duty.[1]  A "special relationship" is defined by R.C 2743.02(A)(3)(b) as follows:

> A special relationship under this division is demonstrated if all of the following elements exist: (i) an assumption by the state, by means of promises or actions, of an affirmative duty to act on behalf of the party who was allegedly injured, (ii) knowledge on the part of the state's agents that inaction of the state could lead to harm; (iii) some form of direct contact between the state's agents and the injured party; (iv) the injured party's justifiable reliance on the state's affirmative undertaking.

The United States mobilized approximately twenty (20) agents, including agents from numerous locations throughout the State of Ohio, and the FBI SWAT team to "rescue" Darnell Lester.  Said agents coordinated this "rescue" over the course of many hours and through the use of a tremendous amount of manpower.  This certainly creates a question of fact as to whether the United States "assumed . . . by actions . . . an affirmative duty . . .." to Darnell Lester.  It cannot reasonably be disputed that the FBI agents knew that Darnell Lester was in danger and that, if he were not rescued properly, "harm" could result.  He was being held at gunpoint by drug dealer/kidnappers!

As to the direct contact prong, there is no dispute that, throughout the course of the evening, Darnell Lester had some thirty-six (36) telephone conversations with various FBI agents, thereby satisfying the "direct contact" requirement (Tr. 317, 328, 348, 1047-1048, 1052-1054).  Lastly,  there exists a question of fact on whether Darnell Lester "justifiably relied" upon the FBI's

---

[1] A duty established through other avenues set forth herein is sufficient without a "special relationship."

undertaking to "rescue" him.  The telephone records do not indicate that Darnell Lester call any other people to assist in his "rescue" after he started talking with the FBI.  Further, who would Darnell Lester call that would be a "better option" to help him than the FBI?  It is certainly "justifiable" for Darnell Lester to rely on the FBI, as opposed to his mother or friends, to "rescue" him from the kidnappers.  For these reasons, there exists a question of fact for trial as to whether there was a "special relationship" between Darnell Lester and the FBI.

The Defendant cites the case of *Vaughn v. United States* in support of its argument.  In *Vaughn*, the FBI had a confidential informant and cooperative witness named Robert Foley.  Mr. Foley was cooperating with the FBI in obtaining the whereabouts of a federal fugitive.  Confidential informant Foley had a party at his home one evening completely unrelated to his duties as an FBI confidential informant.  At this party at Foley's home, an altercation broke out and Foley ultimately shot two people, Rodney and Harry Vaughn.  The plaintiff sued the FBI for negligently allowing Foley to be an informant.  Because Foley was not acting within the scope of any FBI responsibilities and because the FBI had never met or heard of either of the Vaughns, the Sixth Circuit determined that no special relationship existed between the FBI and the previously unknown Vaughn brothers. *Id.*  Clearly, this case sheds no light on whether there exists a "special relationship" between a confidential informant who has been promised FBI protection and the FBI who has expended considerable effort and called out its SWAT Team to protect him.

Defendant also cites *Guccione v. United States* (2d Cir. 1988), 847 F.2d 1031.  In *Guccione*, the FBI had obtained the cooperation of an individual named Weinberg.  Weinberg, as a confidential informant, certainly was not an agent or employee of the FBI.  Nonetheless, cooperating witness Weinberg, in the context of an FBI investigation, made certain statements about the plaintiff, which plaintiff claimed were defamatory.  The plaintiff sued the FBI claiming that it owed him a duty to

control the statements of the confidential informant about his business.  Not surprisingly, the Second Circuit also concluded that there was no "special relationship" between the FBI and the plaintiff giving rise to a duty for the FBI to control statements made by cooperating witness Weinberg in the context of an investigation.  *Id.*  This case also sheds no light on the issues and facts involved in this case.

The last case cited by the Defendant is *Abernathy v. United States* (8th Cir.1985), 773 F2d 184. In *Abernathy,* the plaintiff was beaten to death by an American Indian boy named Thomas Voice. Mr. Voice had been treated by Indian Health Service and Bureau of Indian Affairs Department of Social Services for a psychiatric condition which involved epilepsy and organic brain syndrome. Ultimately Thomas Voice beat plaintiff's decedent to death with a baseball bat.  The plaintiff filed suit against the Department of Social Services and the Bureau of Indian Affairs for failing to have Thomas Voice involuntarily committed.  The United States District Court for the District of South Dakota dismissed plaintiff's claims and the Eighth Circuit of Appeals affirmed.  *Id.*  The basis for the affirmance was that neither of the above entities had sufficient control over Thomas Voice to have him involuntarily committed, therefore, there was no "special relationship."  Further, the decision whether or not Thomas Voice should be committed was discretionary and, therefore, qualified for the discretionary function immunity under the Federal Tort Claims Act.  *Id.*

The defendants, in its supplemental motion, also cites *Summar v. Bennett* (6th Cir. 1998).  In *Summar,* a confidential informant agreed to cooperate with the Rutherford County Sheriff's Department in staging various drug buys.  He provided information regarding a drug purchase made from an individual named Wayne Cartwright.  The district attorney prepared an indictment which stated, as a matter of public record, that "James A. Summar had purchased drugs from Cartwright." The indictment was thereafter served on Cartwright.  Three days later Summar was shot and killed.

The Estate of James Summar filed suit against the Rutherford County Sheriff's Department alleging violation of certain constitutional rights (42 USC §1983) and various state laws.  The theory was that the Rutherford County Sheriff's Department, by disclosing Summar's name in the affidavit, deliberately failed to protect Summary and his identity despite foreseeable risk to his life.

The defendant filed a Motion to Dismiss on the basis of qualified immunity.  The District Court undertook the following analysis in determining that qualified immunity existed under the constitutional claims presented:

> The first step is to determine whether the plaintiff has shown a violation of a constitutionally protected right.  If the answer is yes, then the second step is to determine whether the right is so "clearly established" that a reasonable official would understand that what is doing violates that right.

*Id.* at 1058.

As an initial matter, this is a completely different analysis than the "special relationship" test set forth by the defendant in 2743.02(A)(3)(b).  In fact, none of the elements of Revised Code §2743.02(A)(3)(b) was analyzed in *Summar.*  The Court ultimately affirmed the District Court's dismissal, although stated that "a special relationship is created when law enforcement officers and a confidential informant anticipate that the informant's activities, if discovered, could result in a threat to the life of the informant." *Id.* at 1056.  *Summar* provides no guidance whatsoever on any of the elements of a "special relationship" as is involved in this case.  Further, in *Summar*, law enforcement did not undertake, by promises or actions, any affirmative duty like the FBI did in its attempt to rescue Darnell Lester.  There also was no "direct contact" between the sheriff's department and Summar regarding keeping his name confidential.  This is considerably different than the case herein.

None of the above cases deal with injuries inflicted by employees of the United States Government in the course and scope of their duties.  Further, none of the above cases involve

plaintiffs who had a long-existing relationship with a government agency. Based on the above, Defendants have failed to set forth adequate authority suggesting that a "special relationship" did not exist between Darnell Lester and the FBI. Further, given the extensive communication between Darnell Lester and the FBI, Darnell Lester's reliance on the FBI's undertaking to protect him and the thirty-six (36) telephone conversations between Darnell Lester and the FBI, there certainly exists a question of fact as to whether there was a "special relationship" between Mr. Lester and the FBI sufficient to give rise to a duty for the FBI and its agents not to shoot and kill Mr. Lester. Lastly, because defendants created additional risks by their own conduct, a special relationship is not required and a duty exists regardless of the relationship. *City of Cincinnati v. Beretta* (2002), 95 Ohio St.3d 416.

The defendant, in its supplemental brief, also makes mention that Darnell Lester somehow "assumed the risk" There is no evidence, whatsoever, that Darnell Lester knew, or should have known, that interacting with the kidnappers would result in him being kidnapped. He certainly did not assume the risk of being shot and killed by the FBI! Most importantly, the authority cited by the defendants does not even remotely suggest that assumption of the risk alleviates a legal duty that was otherwise in place.

For all of the foregoing reasons, defendant's motion must be denied because there exists ample authority for the proposition that the defendants owed Darnell Lester a duty.

> **d.** **The FBI and its agents "assumed a duty" to use reasonable care for the protection and safety of Darnell Lester.**

In *Meyers, supra,* the Sixth Circuit recognized that Statement of Torts 324A can impose a duty on an individual under the following situation:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the

> third person for physical harm resulting from his failure to exercise
> reasonable care to perform his undertaking, if (a) his failure to
> exercise reasonable care <u>increases the risk of such harm</u>, or (b) <u>he
> has undertaken to perform a duty owed</u>. . . <u>to the third person</u>, or
> (c) the harm is suffered because of reliance of the other or third
> person upon the undertaking.

Restatement (2nd) of Torts §324A (1965).

The "increased risk" that defendant caused to Darnell Lester has been discussed, *supra*. There is no question that the FBI and its agents had "undertaken" the duty of seeking the safe release and protection of Darnell Lester. The FBI spent a vast amount of time, resources and manpower in orchestrating the events which ultimately led to Darnell Lester's death. FBI departments from both Cleveland and New York were involved in this operation. The FBI SWAT Team called out various SWAT Team members from at least five (5) cities throughout Ohio to assist in securing Darnell Lester's death. The FBI converged on the kidnappers' vehicle, containing Darnell Lester, with no less than six (6) FBI vehicles containing close to twenty (20) FBI agents. There is certainly a question of fact as to whether this amounts to an "undertaking" to protect Darnell Lester or an "assumption" of a duty to protect him.

Further relevant to this issue, is that neither the Cleveland Police Department or the Cuyahoga County SWAT Team were involved in this endeavor. Jurisdiction would, given the facts of the underlying case, be appropriate for either the Cleveland Police Department or the Cuyahoga County SWAT Team to handle. The FBI, however, because of the special relationship with Darnell Lester, affirmatively accepted a duty to protect and rescue him and failed miserably.

> e. **There exists a question of fact as to whether S.A. Werth's conduct was privileged because he acted in "self defense."**

Whether S.A. Werth reasonably believed that his life or others' lives were in danger when he opened fire at the vehicle containing Darnell Lester was addressed previously in Section I (p. 3-5) &

II(B)(2) (p. 8-9).  There exists a question of fact, as described more fully *supra*, which would preclude summary judgment on this issue.  Summary judgment on the issue of the reasonableness of deadly force is generally inappropriate anyway.  *Sova, supra; Estate of Bing, supra; Sigley, supra.*

Defendant, in its supplemental brief, points to several state court decisions and one federal decision in the various criminal trials against the kidnappers Ervin and Waller, as if those were somehow determinative of the issues in this case.  Specifically, defendant states "the findings of these courts should be instructive, if not technically binding, in this civil wrongful death action based on Werth's conduct." (Defendant's Supplemental Brief, p.9).  This is legally incorrect.

Collateral estoppel "prevents <u>parties or their privies</u> from re-litigating facts and issues in a subsequent suit that were fully litigated in a previous suit." *State ex rel Scripts Howard's Broadcasting Co. v. Cuyahoga County Court of Common Pleas, Juvenile Division* (1995), 73 Ohio St.3d, 1924.  Collateral estoppel, also known as issue preclusion, prevents the question that has been <u>actually and necessarily determined</u> by a court of competent jurisdiction in a first cause of action from being re-litigated between the **same parties or their privies** in a second, different cause of action.  *Goodson v. McDonough Power Equipment, Inc.* (1983), 2 Ohio St.3d 193, 195.  There are three elements to the applicability of issue preclusion which are when the fact or issue:

1. <u>Was actually and directly litigation in the prior action;</u>

2. Was passed upon and <u>determined</u> by a court of competent jurisdiction;

3. When the party against whom collateral estoppel is asserted was <u>a party</u> <u>Or in privity with a party to the prior action.</u>

*Thompson v. Wing* (1994), 70 Ohio St.3d 176, 183; *Rizvi v. St. Elizabeth Hospital Medical Center* (146 Ohio App.3d 103, 108) (Ohio App. 7th Dist. 2001).

The burden is upon the party seeking to invoke collateral estoppel to prove that all of the elements of the doctrine apply." *Bentley v. Grange Mutual Casualty Insurance Co.* (1997), 119 Ohio

App.3d 93 (Ohio App. 10th Dist. 1997); *Williams v. Chippewa Roofing, Inc.* (1997), Wayne App. No. 96CA0089 (August 20, 1997), unreported at 5. The defendant herein cannot establish <u>any</u> of the elements of this doctrine.

As an initial matter, plaintiff's decedent Darnell Lester was not a "party" or "in privity" with the parties in the underlying various criminal cases. The underlying criminal cases were brought by the State of Ohio and/or the United States against defendants Aubrey Waller and Gary Ervin. Darnell Lester certainly was not a party or "in privity" with the United States or the State of Ohio or the kidnappers. *Thompson, supra; Rizvi, supra.* "Privity" has been held to be a "succession of interest or relation to the same thing, [and] is established if a non-party has succeeded to a party's interest. *Metal Working Machinery Co. v. Fabco, Inc.* (1984), 17 Ohio App.3d 91. Plaintiff's decedent Darnell Lester was not a successor to the State of Ohio's or the United States' interest in any of the above criminal matters, nor did he succeed to either the State of Ohio's or the United States' rights in those criminal cases.

The gravamen of the "party or privity" requirement is that the party against whom the estoppel is sought had previously been afforded a full and fair opportunity to litigate the disputed issue. *Seibel v. Crown Cork & Seal Co., Inc.* (1986 WL6817 at *3) (Ohio App. 1986). Darnell Lester has never been afforded a "full and fair opportunity to litigate the disputed issue" [whether S. A. Werth's fatal shooting was based upon a reasonable fear for his life or the lives of others] in the underlying criminal cases.

The concept of mutuality in Ohio and due process <u>prohibits the use of collateral estoppel to the detriment of a stranger to the first action</u>. *Blonder Tongue Labs v. The University Foundations* (1971), 402 US 313; *Simon v. Zipperstein* (Ohio App. 1985), 1985 WL6668 at *2. Darnell Lester had no involvement whatsoever with the underlying criminal cases. Therefore, the defendant herein cannot satisfy prong three (3) of the collateral estoppel doctrine.

The defendant also cannot prove that the reasonableness of S.A. Werth's use of deadly force was justified or "actually and directly litigated." Defendant herein cites several passing comments made by the various Appeal Courts in the criminal cases against the kidnappers Waller and Ervin as if they demonstrated that S.A. Werth's conduct was somehow "actually and directly litigated." This could not be further from the truth. The issues involved in the criminal cases cited by the defendant are as follows:

1. *United States v. Ervin* (CA62006) 2006WL3791300 – Defendant Ervin appealed convictions for car jacking, assaulting a federal agent [gunfire], use of a firearm during a violent crime and attempted murder of a federal officer [gunfire]. In the appeal, defendant Ervin made the following assignments of error: (i) the court violated Ervin's constitutional rights afforded by the confrontation clause, (ii) the trial court erred in admitting evidence that Ervin had baggy of crack in his mouth when he was shot, (iii) his double jeopardy rights were violated by two firearm charges in the indictment, and (iv) the trial court erred in failing to give an excessive force jury instruction.

2. *State v. Ervin* (8th Dist 2006), 2006WL2507563, 2006-Ohio-4498 – Defendant Ervin appealed a State Court verdict against him for felony murder, kidnapping, aggravated robbery, grand theft motor vehicle, felonious assault, possession of drugs and carrying a concealed weapon. The assignments of error raised by defendant Ervin were: (i) the trial court erred in denying the motion for acquittal based upon insufficient evidence, (ii) Ervin's convictions were against the manifest weight of the evidence, (iii) the trial court erred in ordering maximum and consecutive sentences without making appropriate factual findings under Revised Code §2929.14 et al..

3. *State of Ohio v. Waller* (8th Dist 2006), 2006-Ohio-4891 – Defendant Waller appealed from a State Court judgment finding him guilty of murder, kidnapping, aggravated robbery, grand theft motor vehicle, felonious assault and having a weapon while under disability. The assignments of error raised by defendant Waller on appeal were: (i) ineffective assistance of counsel failing to request a jury instruction on self-defense, (ii) his convictions were against the manifest weight of the evidence.

The above presents the issues which were "actually and directly litigated." Defendant cannot categorize the passing comments cited in its brief as if those were holdings or factual determinations

made by the various Courts of Appeals in the criminal cases. Because the reasonableness of S.A. Werth's shooting was not "actually or directly litigated" the defendant cannot satisfy elements one (1) or two (2) of issue preclusion, meaning that <u>none of the three (3) elements of issue preclusion are satisfied</u>.

Because the passing comments relied upon by the defendant herein were <u>not</u> the holdings of the various criminal appeals, the comments are, at best, dicta. *State ex rel Donahey v. Edmonson* (1913), 89 Ohio St. 93. Dicta is any statement or comment by a reviewing court that is not essential to its holding. *State v. Ingram* (8th Dist. 1996), 1996WL684337 at *3. **Dicta is <u>not binding on any court</u>.** *Temple v. Liquor Control Commission* (1965), 12 Ohio Misc. 38; *Morse v. State of Ohio* (8th Dist. 2002), 2002WL3149811 at *4.; *Ecker v. Cincinnati* (1936), 52 Ohio App. 422; *State v. Boggs* (1993), 89 Ohio App.3d 206. Even dicta from the Ohio Supreme Court is not binding on any other court in the State of Ohio. *Williams v. Ward* (1969), 18 Ohio App.2d 37, 39.

Pursuant to the above authority, the defendant certainly cannot claim that the passing comments regarding S.A. Werth's use of deadly force in past criminal cases is somehow binding and determinative on the civil action brought by the Estate of Darnell Lester.

## III. <u>CONCLUSION</u>

The discretionary immunity aspect of defendant's motion should be held in abeyance, pursuant to Rule 56(F) of the Federal Rules of Civil Procedure, pending appropriate discovery. Plaintiff agrees that Felicia Priah, as the administratrix of the Estate of Darnell Lester, is the appropriate named plaintiff, but the remaining named plaintiffs are still "claimants" for Darnell Lester's death. The United States is not "immune" from liability because the plaintiff has both pled and created questions of fact as to whether the FBI employees' conduct was reckless or grossly negligent. Summary judgment on whether the use of deadly force is inappropriate under both the

Southern District of Ohio and Sixth Circuit precedent. The FBI agents did owe Darnell Lester a duty as previously stated by both the Southern District of Ohio and the Sixth Circuit. Further, a duty would be established because the FBI increased the risk to Darnell Lester <u>and</u> Darnell Lester relied upon their undertaking, both of which are sufficient to create a duty. Further, although a "special relationship" is not necessary for a duty to exist, a "special relationship" did exist between Darnell Lester and the FBI, which is yet another basis why a duty was created. Further, the FBI "assumed a duty" to Darnell Lester through their actions and conduct.

There exists a question of act as to whether S.A. Werth's conduct was reckless, thereby preventing summary judgment. Because S.A. Werth's conduct involved the use of deadly force, summary judgment is particularly inappropriate *Sova, supra; Estate of Bing, supra; Sigley, supra.*

WHEREFORE, for all the foregoing reasons, defendant's Motion to Dismiss must be denied.

Respectfully submitted,

*/s/ Daniel R. Haude*
Daniel R. Haude (0068385)
**REMINGER & REMINGER CO., L.P.A.**
1400 Midland Building
101 Prospect Avenue, West
Cleveland, Ohio 44115
216-687-1311; Fax: 216-687-1841
dhaude@reminger.com
*Attorney for Plaintiffs*

## CERTIFICATE OF SERVICE

A copy of the foregoing was filed electronically with the Court.  Notice of this filing will be sent to all counsel by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

/s/ Daniel R. Haude
Daniel R. Haude (0068385)
