IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| FELICIA PRIAH, *et al.*, | ) | CASE NO. 1:06 CV 2196 |
| | ) | |
| Plaintiffs, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | WILLIAM H. BAUGHMAN, JR. |
| UNITED STATES OF AMERICA, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

# I.  Introduction

Before me[1] are motions by defendant the United States of America to dismiss or,

alternatively, to grant summary judgment on[2] the complaint of plaintiffs Felicia Priah (Priah)

and others[3] filed pursuant to the Federal Tort Claims Act (FTCA).[4]  The complaint alleges

negligence and wrongful death by agents of the Federal Bureau of Investigation (FBI) in the

shooting of Darnell Lester (Lester), a cooperating government witness, who was killed

---

[1] These motions have been referred to me for a Report and Recommendation. ECF # 50.

[2] ECF ## 14, 23.

[3] Priah is the mother of Darnell Lester.  She filed individually and as the administrator his estate.  Also filing were the decedent's three minor children – Diamond Feneil Lester, Darniesha Burge, and Dakieta Lester – and their respective mothers/guardians:  Dana Watkins, Karen Burge and Dakeita Bryant. In addition, Deborah Duckworth, Lester's sister, filed for herself and as the mother/guardian of Ti'Yon Benjamin and Deon Feneil Benjamin, Lester's minor niece and nephew, who are also named as individual plaintiffs. ECF # 1 at 3-4.  The plaintiffs are collectively referred to herein as "Priah."

[4] 28 U.S.C. § 2671-2680.

during a failed attempt to rescue him from a kidnapping.  These motions have been opposed,[5] and that opposition replied to,[6] in light of this Court's previous ruling on the scope of permissible discovery in this case.[7]  For the reasons that follow, I will recommend that the Government's motion be granted in part and denied in part.

## II.  Facts

### A.    Kidnapping and shooting of Darnell Lester

Most of the essential facts of the kidnapping and shooting of Darnell Lester have been established in the state[8] and federal[9] actions against Lester's two kidnappers and are not disputed here.  However, Priah does contest several of the key facts found by these courts and such disputes will be noted in the following narrative.  Where facts are not contested, the state and federal appellate court opinions will be cited as the source for the particular fact being recounted here.

---

[5] ECF ## 34, 55.

[6] ECF ## 37, 60.

[7] ECF # 49.

[8] *State v. Ervin*, No. 87333, 2006 WL 2507563 (Ohio App. 8th Dist. Aug. 31, 2006) (*Ervin*-Ohio); *State v. Waller*, No. 87279, 2006 WL 2692590 (Ohio App. 8th Dist. Sept. 21, 2006) (*Waller*-Ohio).

[9] *United States v. Ervin*/*United States v. Waller*, 209 F. App'x 519 (6th Cir. 2006) (*E/W*-Fed.).

After being arrested on drug charges in 2002, Darnell Lester became a cooperating witness for the FBI, living in Cleveland but working under the control of Special Agent Brian O'Roarke, an agent in the FBI's New York office.[10]

In December 2003, while not then involved in any active FBI investigation, Lester, in the company of others, drove a GMC van to an inner city food store in Cleveland.[11]  There, he encountered some individuals who eventually, at gunpoint, overpowered Lester, forced him into the back of the van, beat him, and ordered the others out.[12]  The released occupants quickly told various people, including Priah, that Lester had been kidnapped.[13]

Special Agent O'Roarke received a cell phone call in New York from Lester himself that night in which Lester, speaking as if O'Roarke was his "dealer," was uncharacteristically nervous and using "street jargon," which alarmed O'Roarke.[14]  After reporting the incident to superiors, O'Roarke was able to re-connect with Lester and concluded, on the basis of yes-and-no questions, that Lester could not speak freely and so was probably kidnapped and being held for a ransom of either drugs or money.[15]

---

[10] *Ervin*-Ohio, 2006 WL 2507563, at *1.

[11] *Id.*

[12] *Id.*

[13] *Id.*, at *2.

[14] *Id.*

[15] *Id.*

During the rest of that night and into the next day, O'Roarke had 36 short phone conversations with Lester, attempting to arrange an exchange between the kidnappers and O'Roarke as Lester's "dealer."[16]  O'Roarke informed the Cleveland FBI office of this situation and that office activated a SWAT team with the objective of rescuing Lester.[17]

In trying to formulate a rescue plan, the FBI in Cleveland could not determine, despite nearly a day of attempting to trace his cell phone signal, the location where Lester was being held.[18] Consequently, the Cleveland FBI SWAT team finally agreed to meet Lester's captors in the parking lot of a fast-food restaurant at 1:00 a.m.[19]

Accordingly, a SWAT team of FBI agents and vehicles was assembled.[20]  Although Agent O'Roarke testified at the federal trial concerning his numerous cell phone conversations with Lester that provided the FBI with information as to the number of kidnappers, whether they were armed, and what they were demanding,[21] all parties agree that the SWAT team was not told prior to the rescue attempt that Lester would be in the vehicle at the time of the attempted rescue.[22]  In fact, Priah contends that the FBI knew conclusively

---

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *Id.*; *E/W*-Fed., 209 F. App'x 519 at 520.

[21] *E/W*-Fed., 209 F. App'x at 521.

[22] *See*, ECF # 14 (Gov't's first motion) at 6.

for more than one hour before the rescue was attempted that Lester would be in the kidnappers' vehicle, but did not communicate that information to the SWAT team.[23]  Priah further argues that the FBI actually told the SWAT team, erroneously, that Lester would not be in that vehicle.[24]

When agents deployed to the meeting site received word that the kidnappers' vehicle, a GMC Jimmy, had arrived at the parking lot, the SWAT team converged, boxing the Jimmy in with FBI vehicles, as agents left their cars to cover the scene with drawn weapons.[25] However, the kidnappers then suddenly surged the Jimmy forward, breaking the containment and, in an attempt to escape to the street, drove their vehicle at high speed near Special Agent Todd Werth, one of the agents standing in the parking lot providing cover for the rescue operation.[26] Believing his life to be in imminent danger,[27] a fact disputed here by Priah, Special Agent Werth fired three shots into the speeding Jimmy, one of which struck and killed Lester,[28] who was in the front passenger seat.[29]

---

[23] ECF #18 at ¶¶ 35-37.

[24] *Id.*

[25] *Ervin*-Ohio, 2006 WL 2507563, at *2.

[26] *Id.*

[27] *E/W*-Fed., 209 F. App'x at 521.

[28] *Id*.

[29] *Ervin*-Ohio, 2006 WL 2507563, at *3.

Priah, as noted, vigorously disputes that Special Agent Werth could reasonably have believed his life or the lives of others was in danger at the time he fired the shot that killed Lester.  Specifically, Priah asserts that physical evidence shows that Werth's fatal shot was fired as the kidnappers' vehicle was going past, not at, Werth, thus negating any claim of self-defense.[30]  Lester's two kidnappers were arrested at the scene[31] and eventually charged with various state and federal crimes, including Lester's murder.[32]

**B.    The state and federal trials of Lester's kidnappers**

Gary Ervin, who was driving the Jimmy that night, and co-defendant Aubrey Waller pled not guilty in state court to the fifteen-count indictment returned against them by an Ohio grand jury.[33]  Accordingly, after a drug possession charge was dropped prior to trial, both men received a jury trial at which they both were eventually convicted of the felony murder of Lester, as well as kidnapping, aggravated robbery, grand theft motor vehicle, six counts of felonious assault on law enforcement agents (including the attempt to run down Special Agent Werth), and carrying a concealed weapon.  These convictions were upheld on appeal.[34]

In federal court, Ervin and Waller were tried together before a jury and eventually found guilty of car jacking, assaulting a federal agent, two counts of the use of a firearm

---

[30] ECF # 34 at 4.

[31] *Ervin*-Ohio, 2006 WL 2507563, at *3.

[32] *Id*. at *1; *E/W*-Fed., 209 F. App'x at 520.

[33] *Ervin*-Ohio, 2006 WL 2507563, at *1.

[34] *Id*.; *Waller*-Ohio, 2006 WL 2692590, at *2.

during a violent crime, and, solely as to Waller, three counts of attempted murder of a federal officer[35] arising from his shooting at agents after the Jimmy had crashed into a fence attempting to exit the parking lot.[36] Ervin was sentenced to 46 years in federal prison; Waller received 57 years.[37]  The federal convictions and sentences were affirmed on appeal.[38]

## C.    The complaint and motion to dismiss

The essential procedural history here involves an initial complaint which was superceded by a second amended complaint that is substantially the same as the first, but adds additional theories of recovery.  In the second amended complaint, Priah alleges that FBI agents, contrary to state and federal law, were the direct and proximate cause of Darnell Lester's death[39] when, by their negligent, reckless, grossly negligent, willful, and wanton actions,[40] they:  (1) failed to tell the SWAT team that Lester would be in the kidnappers' vehicle at the time of the planned rescue;[41] (2) formulated the plan to "jump" the kidnappers' vehicle and rescue Lester based on the false information that Lester would not be in that

---

[35] *E/W*-Fed., 209 F. App'x at 520.

[36] *Id.* at 521.

[37] *Id.* at 520.

[38] *Id*. at 522.

[39] ECF # 18 at ¶ 16.

[40] *Id*. at ¶ 17.

[41] *Id.* at ¶¶ 38-39.

vehicle;[42] and (3) fired upon the kidnappers' vehicle at the scene, without any justifiable reason, killing Lester.[43]

The FBI, prior to answering the original complaint, moved to dismiss that complaint for lack of subject matter jurisdiction and for failure to state a claim upon which relief could be granted, or, alternatively, for summary judgment.[44]  In that motion, the Government argues: (1) that the discretionary function exemption to the FTCA bars any recovery for claims based on how the FBI conducted the rescue operation that resulted in Lester's death; and (2) that Ohio law bars claims by all plaintiffs except the administrator of the decedent's estate, that the United States is immune from suit for negligence, and that Ohio law grants statutory immunity to law enforcement officers in cases alleging wrongful death.[45]

Priah then filed the second complaint and sought additional discovery in advance of any ruling on the motion to dismiss.[46]  In response, the Government filed an answer denying

---

[42] *Id.* at ¶ 41.

[43] *Id.* at ¶¶ 48-50.

[44] ECF # 14.

[45] *Id.*

[46] ECF # 19.

the claims of the second complaint,[47] restated its motion to dismiss or for summary judgment in terms of the second complaint,[48] and opposed Priah's request for additional discovery.[49]

The discovery dispute that then arose concerning Priah's request for additional discovery is thoroughly explored in the Court's Order[50] permitting some additional limited review under seal of unredacted documents previously provided to Priah in redacted form, as well as of documents provided under seal only to the Court.  However, the Order also denied the rest of Priah's request for additional discovery as to how FBI agents planned the rescue attempt and communicated information in light of FBI policies.

Priah has directly filed a response in opposition to the motion to dismiss or alternatively for summary judgment.[51]  In it, she concedes that Priah alone is the only proper plaintiff in this action, but argues that the other named plaintiffs should nevertheless continue to be recognized as "claimants" under Ohio's wrongful death statute.[52]  In addition, she contends that a jury question exists as to whether the United States was grossly negligent or reckless in failing to transmit to the SWAT team the information that Lester would be in the

---

[47] ECF # 21.

[48] ECF # 23.

[49] ECF # 25.

[50] ECF # 49.

[51] ECF # 34.

[52] *Id.* at 6.

kidnappers' vehicle.[53]  Moreover, she maintains that a separate jury question is present as to whether Special Agent Werth was grossly negligent or reckless in firing the shot that killed Lester.[54]  Finally, she avers that:  (1) a special relationship existed between Lester and the FBI, creating a duty to protect him that was breached here,[55] and (2) no collateral estoppel or *res judicata* exists here concerning the conclusion, expressed, Priah contends, as *dicta* in various court opinions, that Special Agent Werth acted in self-defense.[56]

## III.   Analysis

### A.   Standard of review – dismissal for failure to state a claim/lack of jurisdiction

The standard of review for analyzing a motion to dismiss for failure to state a claim made pursuant to Federal Rule of Civil Procedure 12(b)(6) was recently articulated by the Sixth Circuit in *Association of Cleveland Firefighters v. City of Cleveland*[57] as follows:

> Whether a district court properly dismisses a suit pursuant to Rule 12(b)(6) is a question of law subject to de novo review.  The Supreme Court has recently clarified the law with respect to what a plaintiff must plead in order to survive a Rule 12(b)(6) motion.  The Court stated that "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Additionally, the Court emphasized that even though a complaint need not contain "detailed" factual allegations, its "[f]actual

---

[53] *Id.* at 7-8.

[54] *Id.* at 8-13.

[55] *Id.* at 13-23.

[56] *Id.* at 24-28.

[57] *Ass'n of Cleveland Firefighters v. City of Cleveland*, 502 F.3d 545 (6th Cir. 2007).

allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true."  In so doing, the Court disavowed the oft-quoted Rule 12(b)(6) standard of *Conley v. Gibson* (recognizing "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that a plaintiff could prove no set of facts in support of his claim that would entitle him to relief"), characterizing that rule as one "best forgotten as an incomplete, negative gloss on a accepted pleading standard."[58]

**B.    Claims concerning any alleged deficiencies in planning and communication by the FBI in preparing for or executing the rescue attempt here are precluded by the discretionary function exemption of the FTCA.**

*1.    Standard of review – discretionary function exception*

The applicable law concerning the FTCA and the discretionary function exemption were set forth in some detail in the Court's prior Order.[59]  That discussion will, therefore, only be summarized here.

The FTCA represents a grant of consent by the United States, subject to certain exceptions, to be sued for a tort committed by an employee "in the same manner and to the same extent as a private individual under like circumstances."[60] One of the statutory limitations on this grant is known as the discretionary function exception.  That exception provides that if any claim is based on a federal employee's performance or failure to perform

---

[58] *Id.* at 548 (internal citations omitted).

[59] ECF # 49.

[60] 28 U.S.C. § 2674.

"any discretionary function or duty," federal courts will be without jurisdiction to entertain that claim, whether or not there was an abuse of that discretion.[61]

Courts employ a three-step process in evaluating assertions of this exception.[62]  First, a court must "identify the conduct that allegedly caused the harm."[63]  Next, the court must determine whether that specified conduct "violated a mandatory regulation or policy that allowed no judgment or choice.  If so, the discretionary function [exception] does not apply" because the employee was required to comply with the policy directive.[64]  Finally, if the challenged action is deemed discretionary, a court must determine whether the "[discretionary] conduct is 'of the kind that the discretionary function was designed to shield.'"[65]

Because the discretionary function exception "clearly limits the jurisdiction of federal courts,"[66] the burden of establishing subject matter jurisdiction by showing that the

---

[61] 28 U.S.C. § 2680(a); *Sharp ex rel. Estate of Sharp v. United States*, 401 F.3d 440, 443 (6th Cir. 2005).

[62] As was discussed in the earlier Order (ECF # 49), published cases frequently characterize the analysis involved as being a two-step process.  However, it is clear that the oft-stated two elements of the mandatory analysis rest upon an equally mandatory predicate step.  Therefore, that additional required step should be included in formulating the components of the rubric in order that the total analytical framework is stated as a whole.

[63] *Wood v. United States*, 115 F. Supp. 2d 9, 13 (D. Maine, 2000) (quoting *Shansky v. United States*, 164 F.3d 688, 690 (1st Cir. 1999)); *Bancheck v. United States*, No. 1:06CV3108, 2007 WL 1683829, at *2 (N.D. Ohio June 8, 2007).

[64] *Rosebush v. United States*, 119 F.3d 438, 441 (6th Cir. 1997).

[65] *Id*. (quoting *United States v. Gaubert*, 449 U.S. 315, 322-23 (1991)).

[66] *Sharp*, 401 F.3d at 443, n.1.

-12-

discretionary function exception does not apply initially falls on the plaintiff.[67]  Only after

a plaintiff has successfully invoked jurisdiction with a pleading that, on its face, alleges a

claim not subject to the exception created by § 2680 does the burden shift to the United

States to prove the applicability of § 2680 to the claim presented.[68]

**2.      *Priah's claims concerning the FBI's planning of Lester's rescue, including the
transmission of information to the SWAT team about Lester's location, involve
discretionary functions pursuant to § 2680 and so should be dismissed as outside
of the jurisdiction of this Court and so failing to state a claim upon which relief
may be granted.***

Initially, it is important to restate that, pursuant to this Court's prior Order,[69] Priah was

permitted to fully review under seal all of the relevant unredacted FBI manuals and policies

applicable to hostage rescue situations.  Based on that review, she now contends: (1) that the

FBI violated "dozens" of its written policies by either (a) proceeding with the rescue attempt

without knowing for certain where Lester was, or (b) affirmatively misstating to the SWAT

team before commencing the operation that Lester would not be in the kidnappers' vehicle;[70]

(2) that these policies which were allegedly violated are mandatory, such that an agent has

no discretion to fail to account for the correct location of a kidnap victim or to transmit

---

[67] *Bancheck*, 2007 WL 1683829, at *1.

[68] *Carlyle v. United States, Dep't of the Army*, 674 F.2d 554, 556 (6th Cir. 1982).

[69] ECF # 49.

[70] ECF # 56 at 2-13.  This brief is filed under seal pursuant to a protective order in that
it references confidential FBI policies and procedures applicable in responding to hostage
and kidnap situations.  It will be quoted and/or referenced here with due regard for the
sensitive nature of the materials being discussed.

erroneous information;[71] and (3) even if the various policies here are not mandatory and the agents conduct here was discretionary, the discretionary function exception was not intended to shield agents from liability for "forgetting to communicate and/or inquire about the whereabouts of the [kidnap] victim."[72]

The Government, in response,[73] notes that all the relevant documents – the FBI's Manual of Internal Operating Guidelines (MIOG), the SWAT Team Leaders Handbook, and the SWAT Lesson Plan Manual – are not mandatory directives, but, necessarily, are "general checklists and training outlines which do not mandate any course of action but rather set forth elements and general factors to consider in SWAT operations."[74]  Specifically, it observes that the frequently cited provisions of these documents by the plaintiffs to the effect that each SWAT team member knows the location of the hostage are not a mandatory directive, but an important factor or element to include, insofar as possible, in plans made or orders given in the midst of a fluid situation.[75]  In that regard, the Government also emphasizes that these documents highlight the inherently discretionary nature of any action taken in a hostage rescue attempt, which involves the potentially conflicting interests of (primarily) freeing the

---

[71] *See*, *id.* at 13-14.

[72] *Id.* at 14.

[73] ECF # 60.  Like Priah's brief, the Government's brief here is also filed under seal pursuant to a protective order.  It, too, directly references elements of many confidential FBI law enforcement procedures and so will also be here treated circumspectly.

[74] *Id.* at 9.

[75] *See*, *id.* at 10.

-14-

hostage and (secondarily) apprehending the kidnappers.[76]  It further argues that this discretion in the context of a hostage rescue is sound public policy and thus shielded by the discretionary function exception.[77]

I find the Government's arguments entirely persuasive.  I will proceed to examine those arguments within the context of the three-step analysis mandated by the case authority.

As to the initial step – identifying the government action that caused the harm complained of – Priah appears to argue that two actions by the Government caused Lester's death: (1) the failure to communicate/deliberate miscommunication between agents as to Lester's whereabouts during the rescue attempt, and (2) the decision to proceed with the rescue without knowing conclusively where Lester was.[78]

However, as to both actions, the Government makes the persuasive counter argument that the proximate cause of Lester's death was not any communication error by the agents prior to commencing the rescue attempt,[79] nor was Lester's death caused by the decision to proceed with the rescue in the face of incomplete information.  Instead, the proximate cause of Lester's death was the subsequent independent decision by Special Agent Werth to fire on the kidnappers' vehicle when he believed it came toward him and endangered the lives

---

[76] *Id.* at 10-11, citing *Flax v. United States*, 847 F. Supp. 1183, 1190 (D.N.J. 1994).

[77] *Id.* at 11.

[78] *See*, ECF # 60 at 3, referencing ECF # 56 (Priah's brief) at 2-13.

[79] The Government also disputes Priah's characterization of the testimony of record that the FBI either failed to inquire as to Lester's whereabouts or knew he would be in the car but deliberately told the SWAT team to the contrary.  *See*, ECF # 60 at 4.

of the other agents at the scene.[80]  The testimony of record is unrebutted that this decision was made by Special Agent Werth alone and not as the result of any pre-determined plan – properly formulated or otherwise – to fire on the kidnappers.[81]  Further, as stated by Special Agent Werth also in unrebutted testimony, it was a decision that would not have been different if he had known Lester was in the vehicle.[82]

Accordingly, I am not convinced that Priah has satisfied the first requirement for a discretionary function analysis to apply here:  identifying a governmental action that *caused* the harm complained of.  In this case, even if, *arguendo*, Priah is entirely correct that mandatory, non-discretionary FBI policy is that no hostage rescue plan may ever go forward without totally certain knowledge of the hostage's location, Lester was not proximately

---

[80] *See*, *Ervin*, 209 F. App'x at 521.  ("Ervin's attempt to run down the FBI agent caused the agent to shoot in self-defense.  Darnell Lester died because of Ervin's actions."); *see also*, Ervin, 2006 WL 2507563, at *4 (analyzing Lester's death in light of Ohio law of proximate cause and concluding that Ervin and Waller's conduct in seeking to "avoid apprehension and driv[e] at S.A. Werth" was, together with Special Agent Werth's decision to shoot under those circumstances, the proximate causes of Lester's death).  The important fact here is that regardless of whether Special Agent Werth's action was correct or negligent, two courts have concluded that Werth's action, responding to Ervin's decision to flee, was, under Ohio law, the proximate cause of Lester's death – not any prior decisions or omissions by the FBI in planning or staffing the rescue attempt.

[81] *See*, ECF # 27 at 5.

[82] *See*, ECF # 60 at 5.

-16-

harmed[83] by a breach of that rule, but as the direct result of Special Agent Werth's independent decision to fire upon the kidnappers' vehicle under the circumstances he described, regardless of whether he had known Lester was inside or not.[84] Nonetheless, I will proceed to examine the next two elements of the discretionary function exception test.

As I noted in the earlier Order[85] concerning the scope of discovery, the "overwhelming consensus of federal case law establishes that criminal law enforcement decisions – investigative and prosecutorial alike – are discretionary in nature and, therefore, by Congressional mandate, immune from judicial review."[86]

In this case, as with any hostage/kidnap rescue, the FBI manuals and policies, read in their entirety, attempt to identify all the aspects to be considered by agents to maximize the chances of a successful operation both as to freeing the victim and apprehending the abductors. These potentially incompatible goals inherently require that agents have the discretion to take action best suited to achieving those goals in the context of circumstances

---

[83] Ohio law defines "proximate cause" as "an act or failure to act which, in a natural and continuous sequence, directly produces the injury and without which it could not have occurred." *Brott Mardis & Co. v. Camp*, 147 Ohio App. 3d 71, 75-76, 768 N.E.2d 1191, 1194 (Ohio App. 9th Dist. 2001) (citing *Jeffers v. Olexo*, 43 Ohio St. 3d 140, 143, 539 N.E.2d 614, 617 (1989)).

[84] *See*, ECF # 27 at 5. "[T]he shooting itself was not caused by the violation of a mandatory directive concerning the kidnapping investigation or the planning of a response ... Plaintiffs have not alleged and cannot prove that a violation of a mandatory directive proximately caused Lester's death."

[85] ECF # 49.

[86] *Mesa v. United States*, 837 F. Supp. 1210, 1213 (S.D. Fla. 1993).

-17-

that are changing and dangerous.  In that regard, the manuals also explicitly acknowledge that in the real world action may need to be taken when, despite best efforts, perfect certainty even as to key objectives is not possible.  In short, the individual elements of these manuals cited by Priah do not, and could not, standing alone and with no relationship to other objectives and circumstances, constitute binding, mandatory injunctions on agents.[87]

Deciding whether (1) to wait and seek greater clarity in a dangerous, changeable situation, or (2) to move swiftly, despite not knowing all of what one would plainly wish to know when an opportunity for life-saving success, perhaps fleeting, presents itself, is the very definition of a discretionary decision and the very essence of many law enforcement actions.  It is also the very thing the discretionary function exception was intended to protect from after-the-fact second-guessing when the outcome, as here, is tragically unsuccessful.[88]

Therefore, I recommend finding that the discretionary function exception to the FTCA applies to all the actions taken by the FBI in investigating, planning, and commencing the rescue/arrest efforts directed to Lester and his abductors.  Accordingly, I further recommend that if the preceding recommendation is adopted, the Government's motion to dismiss all Priah's claims in that regard for lack of jurisdiction be granted.

---

[87] *See*, *Flax*, 845 F. Supp. at 1190.  "While the regulations, rules and policies governing the FBI provide broad-based and general guidelines, the very nature of close surveillance suggests that the investigating agent *must* be afforded a significant level of discretion as to how the search will be conducted."  (Emphasis added).

[88] *See*, *Pooler v. United States*, 787 F.2d 868, 871 (3rd Cir. 1986).  "[W]hen the sole complaint is addressed, as here, to the quality of the investigation as judged by its outcome, the discretionary function should, and we hold, does apply.  Congress did not intend to provide for judicial review of the quality of investigative efforts."

**C.    The United States is entitled to summary judgment in its favor as to claims that it was grossly negligent in transmitting information concerning Lester's location and/or that Special Agent Werth was grossly negligent or reckless in firing the shot that killed Lester.**

*1.    Standard of review – summary judgment*

The standard of review applicable to a motion for summary judgment is well-established and well-known.

The Federal Rules of Civil Procedure provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[89] Summary judgment is appropriate when the moving party demonstrates that there is no genuine issue of material fact regarding any essential element of the non-moving party's case on which the nonmovant would bear the burden of proof at trial.[90]

In that respect, a fact is "material" for purposes of summary judgment if proof of that fact would have the effect of establishing or refuting an essential element of the claim or a defense.[91] A dispute over a material fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."[92]

---

[89] Fed. R. Civ. P. 56(c).

[90] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[91] *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984).

[92] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party has the initial burden of proof of showing the absence of a genuine issue of material fact as to an essential element of the nonmovant's case.[93]  Once a moving party satisfies this burden, the burden shifts to the nonmoving party to set forth specific facts showing the existence of a genuine issue for trial.[94]

To create a genuine issue of material fact for trial, the nonmoving party must do more than raise some doubt or present merely colorable evidence.[95]  Further, it may not simply rely on the allegations of the pleadings.[96]  However, the nonmoving party "need not 'produce evidence in a form that would be admissible at trial in order to avoid summary judgment.' Instead, the relevant inquiry is whether the nonmoving party has designated 'specific facts showing there is a genuine issue for trial.'"[97]

The court must evaluate all the evidence presented "in the light most favorable to the party opposing the motion."[98]  In evaluating the evidence, however, the court is not permitted to judge that evidence nor to make findings of fact.[99]

---

[93] *Celotex Corp.*, 477 U.S. at 323.

[94] *Anderson*, 477 U.S. at 256.

[95] *Id.* at 249-50.

[96] *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

[97] *O-So Detroit, Inc. v. Home Ins. Co.*, 973 F.2d 498, 505 (6th Cir. 1992) (internal citations omitted).

[98] *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

[99] *60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435-36 (6th Cir. 1987).

-20-

In all this, the court must recognize that "summary judgment is not a disfavored procedural shortcut, but rather an integral part of the federal rules of civil procedure as a whole."[100] Essentially, summary judgment is the means by which the moving party may compel the nonmoving party to "put up or shut up" with regard to a critical issue of material fact.[101]

## 2.    *Standard of review – gross negligence/recklessness*

Liability for any tort, including wrongful death, under the FTCA is determined, by statute, according to the law of the place where the act or omission giving rise to the claim took place.[102] Moreover, the United States is entitled to assert any defense of immunity available to its employee or to the government, including state law immunities.[103]   In addition, Ohio statute specifically grants state law immunity from liability in civil actions for personal injury or wrongful death to federal law enforcement on the same basis as that given to individual employees of Ohio political subdivisions.[104]   Ohio law provides immunity in that regard unless the employee of a political subdivision acts in a wanton or reckless

---

[100] *Silver v. Franklin Twp. Bd. of Zoning Appeals*, 966 F.2d 1031, 1034 (6th Cir. 1992) (citing *Celotex*, 477 U.S. at 327).

[101] *Cox*, 53 F.3d at 149 (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989)).

[102] 28 U.S.C. § 2674 (the United States is liable "in the same manner and to the same extent as a private individual in like circumstances"); *Harris v. United States*, 422 F.3d 322, 326-27 (6th Cir. 2005).

[103] *See*, *Ewolski v. City of Brunswick*, 287 F.3d 492, 517 (6th Cir. 2002).

[104] Ohio Rev. Code § 9.88.

manner, or with malicious purpose.[105]  In *Ewolski v. City of Brunswick*,[106] the Sixth Circuit, acting pursuant to the FTCA and Ohio law, formulated the standard of review for cases alleging wrongful death by employees of a political subdivision in Ohio:

> [A]s employees of a political subdivision [in Ohio], the individual defendants are entitled to statutory immunity unless their "acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner." The standard for recklessness employed by Ohio courts holds that "[t]he actor's conduct is in reckless disregard for the safety of others if ... such risk is substantially greater than that which is necessary to make his conduct negligent."[107]

### 3.    *Analysis*

Priah here again argues initially that FBI agents definitively knew, prior to commencing the rescue attempt, that Lester would be in the kidnappers' vehicle during the rescue but either neglected to tell the SWAT team this crucial fact or inexplicably furnished the SWAT team with directly contrary information. While the Government responds, often persuasively, that the evidence does not prove what Priah contends it proves in this regard, any dispute here is not relevant or actionable for two reasons.

First, as noted, the Government is entitled to immunity from suit as to how it conducted the investigation of Priah's abduction and planned his rescue.  Second, as also noted, the proximate cause of Lester's death was the independent decision of Special Agent Werth to fire on the kidnappers' vehicle and not the inevitable consequence of an

---

[105] Ohio Rev. Code § 2744.03(A)(6).

[106] *Id.*

[107] *Id.* at 517 (internal citations omitted).

allegedly deficient plan.  Moreover, as Special Agent Werth stated in unrebutted testimony, he would have fired on the kidnappers' vehicle under the circumstances obtaining at that time whether he knew Lester was inside or not.  Thus, the critical issue is whether Special Agent Werth's decision to fire is actionable or not.

In that regard, Priah essentially claims that two facts – both which were established during the trials of the kidnappers and neither of which are disputed by the Government – fatally undercut the conclusions reached during the trials that Special Agent Werth acted properly in shooting at the kidnappers' vehicle.  Again, it is important to stress that Priah is here contesting the legal conclusions previously drawn from already established, non-disputed facts.  She does not offer any new facts nor is she asking the Court to reweigh any previously resolved factual conflict.  As such, this is a wholly appropriate matter for summary judgment.

Priah asserts that because:  (1) the shots fired by Special Agent Werth struck the kidnappers' vehicle from the side, not the front; and (2) Special Agent Werth could not identify any other agents that were in the path of the kidnappers' vehicle at the time he fired; a jury question exists as to whether Special Agent Werth acted properly or recklessly.[108]  I do not find Priah's argument persuasive.

First, even construing all evidence most favorably to Priah, the totality of the evidence developed at the kidnappers' trials shows that Special Agent Werth's actions were objectively reasonable.  Utilizing the standard articulated by the Sixth Circuit in *Bing*, which

---

[108] ECF # 34 at 8-10.

analyzes the totality of the circumstances as they presented themselves to the officer at the scene when the decision to use force was made, Special Agent Werth knew that the crime here was extremely serious, involving violent kidnappers from the drug underworld who were known to have (a) beaten Lester into submission at the commencement of the kidnapping, (b) threatened to kill him if not paid a ransom, and (c) been armed at the time of the rescue.  In addition, Special Agent Werth actually saw the Jimmy break containment created by clearly marked law enforcement vehicles by ramming one or more of those occupied vehicles without regard for the safety of their occupants as it, by all accounts, "surged" forward in a  sudden – and violent – attempt to resist arrest and flee.  Special Agent Werth's testimony is corroborated by all other witnesses that the Jimmy, as it was crashing through the containment barrier of FBI vehicles, did initially directly come at Special Agent Werth just before he was able to step aside as the Jimmy passed.  Moreover, there is no factual dispute that there were some 16 SWAT team members at various locations around the rescue scene.

In such circumstances –  (1) violent kidnappers, (2) known to be armed, (3) at night, (4) knowing that they were about to be lawfully arrested, (5) driving their SUV directly at occupied, marked containment vehicles of the FBI, (6) in a sudden attempt to escape capture that (7) brought their Jimmy directly on a path toward Special Agent Werth, (8) who was standing in the parking lot not protected in a vehicle and (9) in the vicinity of numerous other agents in the parking lot – it was reasonable for Special Agent Werth, as he managed to move aside to save his own life:  (1) not to have turned his attention away from the surging Jimmy

bearing down on him to determine precisely where the other agents were; (2) to have concluded that those other agents, known to be at the scene, were likely to be at risk from a vehicle that had just rammed vehicles containing FBI agents and come directly at him; and (3) to have decided that deadly force was required to stop the Jimmy.

While I am fully persuaded that, as a matter of law, the uncontroverted evidence establishes that Special Agent Werth's use of deadly force was objectively reasonable, the Government is not required to meet that test in order to prevail here.  Rather, the issue is whether there remains an issue of fact as to whether Special Agent Werth's actions in using deadly force were grossly negligent or reckless.

Even if a jury could conclude that Special Agent Werth should have decided not to fire in the split-second that the Jimmy suddenly passed him by because (1) he was then personally out of danger and (2) he did not know enough about the location of other agents to make an informed judgment on their risk of danger, that would not make the decision to fire, as a matter of law, reckless or grossly negligent.  There is simply no evidence that Special Agent Werth, in making his instantaneous determination about firing on the armed, dangerous felons that had just rammed occupied vehicles in their attempt to escape, displayed such a reckless disregard for the safety of others that any mistake in judgment here was substantially greater than that necessary to make his conduct merely negligent.  There is absolutely no evidence proffered by Priah to prove that Special Agent Werth was acting in bad faith or wantonly, without any justifying reason for his action whatsoever.

In sum, I recommend finding that Special Agent Werth's use of deadly force in this instance was, as a matter of law, reasonable.  Further, I recommend finding that, at a minimum, Special Agent Werth's conduct could not, as a matter of law, be found reckless or grossly negligent.  Accordingly, I recommend that the Government's motion for summary judgment in this regard be granted.

## IV.   Conclusion

In sum, for the foregoing reasons, I recommend that the Government's motion to dismiss Priah's claim as to alleged failure by the FBI to follow its procedures and policies in planning, communicating, and executing the rescue attempt be granted for failing to state a claim upon which relief may be granted, and that the Government be granted summary judgment in its favor as to Priah's claim that any individual liability on the part of Special Agent Werth exists for the death of Darnell Lester.


Dated:   January 25, 2008                          s/ William H. Baughman, Jr.
                                                   United States Magistrate Judge


## Objections

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within ten (10) days of receipt of this notice.  Failure to file objections within the specified time waives the right to appeal the District Court's order.[109]

---

[109] *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).